UNITED STATES of America,

v.

Glenn MARCUS, Defendant.

No. 05–CR–457 (ARR).

United States District Court,
E.D. New York.

May 17, 2007.

Pamela Ki Mai Chen, United States Attorney, Brooklyn, NY, Attorney for the United States.

Maurice H. Sercarz, Sercarz & Riopelle, New York, NY, Attorney for the Defendant.

## OPINION AND ORDER

ROSS, United States District Judge.

Defendant Glenn Marcus was tried before a jury on charges of sex trafficking, in violation of 18 U.S.C. § 1591; forced labor, in violation of 18 U.S.C. § 1589; and dissemination of obscene materials through an interactive computer service, in violation of 18 U.S.C. § 1462. The charges arose out of conduct related to an alternative sexual lifestyle, known as bondage, dominance/discipline, submission/sadism, and masochism ("BDSM"). At trial, the complaining witness testified that she entered into a consensual BDSM relationship with the defendant, who subsequently used force and coercion to prevent her from leaving when she sought to do so. She testified that she remained with the defendant against her will for nearly two years, during which period she created and maintained the defendant's website and engaged in BDSM conduct with the defendant and others that was photographed and placed on the website. On March 5, 2007, a jury found the defendant guilty of sex trafficking and forced labor and not guilty of dissemination of obscene materials. The jury also found that the government had proved the defendant committed aggravated sexual abuse in relation to the forced labor count, a statutory aggravating factor.

Defendant now renews his Fed. R.Crim.P. 29 motion for judgment of acquittal on the sex trafficking and forced labor counts, which he made initially at the close of the government's case and renewed at the end of all the evidence. The defendant raises three grounds for setting aside his conviction. First, he contends that the Trafficking Victims Protection Act of 2000 ("TVPA")—the legislation enacting both statutes at issue—was not intended to apply to conduct that took place as part of an "intimate, domestic relationship" or to consensual BDSM activities. Second, he claims that the term "commercial sex act" in 18 U.S.C. § 1591 does not apply when the defendant received revenue for photographic depictions of sex acts as opposed to the acts themselves. Third, he argues that the government has failed to present sufficient evidence for a reasonable jury to find a nexus between the force or coercion employed by the defendant and the commercial sex act element of his sex trafficking conviction or the labor or services element of his forced labor conviction. In the alternative, defendant moves for a new trial pursuant to Fed.R.Crim.P. 33 so that the jury may be instructed that a conviction requires that the dominant purpose of the defendant's use of force or coercion is to cause the victim to engage in a commercial sex act or to obtain her labor or services. For the reasons stated below, the defendant's motions are denied.

## BACKGROUND

Viewing the evidence in the light most favorable to the government, see United States v. Autuori, 212 F.3d 105, 108 (2d Cir.2000), the relevant evidence adduced at trial is as follows.[1]

### 1. Events from 1998 to June 1999

In 1998, Jodi,[2] the complaining witness, learned about BDSM on the internet and

---

**1.** As the defendant's Rule 29 motion was initially made at the close of the government's case and the court reserved its ruling, the defendant's challenge to the sufficiency of the evidence is reviewed based on the evidence presented during the government's case-in-chief. See Fed.R.Crim.P. 29(b); Autuori, 212

F.3d at 108. Insofar as evidence subsequently presented is relevant to the disposition of the defendant's Rule 33 motion, such evidence will be reviewed separately in the course of deciding that motion.

**2.** By opinion and order dated January 31, 2007, the court granted the government's mo-

began visiting online chatrooms to find out more information. (Trial Transcript [hereinafter "Tr."] at 70–71.) At the time, Jodi understood BDSM to be a type of relationship in which, within certain guidelines and limits, one person is dominant and the other submissive. (*Id.*) After two relatively brief BDSM relationships, Jodi met the defendant online in the fall of 1998. (*Id.* at 71–73.) The defendant—identified by the screen name "GMYourGod"—called himself the only true "master" and referred to the women in BDSM relationships with him as "slaves" who "served" him. (*See id.* at 73, 75–76.) He explained to Jodi that, in the type of BDSM he practiced, he did not allow the use of any limits or safe words.[3] (*Id.* at 74.) By way of example, he explained that he could decide to cut off a slave's limb or order her to kill a small child. (*Id.* at 74–75.) Two of the defendant's slaves involved in the online conversation—Joanna, identified by the screen name "GMsdogg," and Celia, identified by the screen name "nameless"—assured—Jodi that the defendant had never engaged in behavior of this nature previously, and Joanna told Jodi that she did not believe he would do so in the future. (*Id.* at 75.) In subsequent conversations by telephone, the defendant communicated to Jodi that she belonged to him and needed to serve

him. (*Id.* at 75–76.) During these early encounters with the defendant, Jodi shared intimate details about her life experiences, including that she had been physically and emotionally abused by her mother and had struggled with an eating disorder. (*See id.* at 76–77.)

In October 1998, Jodi traveled from her home in the Midwest[4] to Joanna's apartment in Maryland to meet the defendant. (*Id.* at 76.) Over the three to four days that she was there, the defendant whipped her and carved the word "slave" on her stomach with a knife. (*Id.*) In November 1998, Jodi again traveled to Maryland to meet the defendant. (*Id.* at 77.) During these two visits, the defendant complimented Jodi on her looks and performance of BDSM activities. (*Id.* at 77–78.) He also continued to emphasize that she belonged to him and needed to be with him. (*Id.*)

After Jodi's second visit, the defendant informed her that he wanted her to move to Joanna's apartment in Maryland and Jodi agreed to do so. (*Id.* at 78.) Prior to moving, Jodi submitted a petition, which she drafted and Joanna edited, in which she asked the defendant to allow her to serve him as his slave. (*Id.* at 79–81; *see also* Govt. Ex. 2C,[5] at 1051.) In the peti-

---

tion to allow the complaining witness and one additional witness to testify at trial using only their first names due to the explicit nature of the conduct about which they would be testifying and the likelihood of damaging publicity. Prior to trial, the defendant and the government agreed that the same accommodation would be granted to defense witnesses and any other individuals whose names would be mentioned at trial in connection with sexually explicit conduct. Accordingly, the complaining witness will be referred to as "Jodi" for the purposes of this opinion. Likewise, the court will identify by first name those individuals who were referred to in that manner at trial.

3. At trial, Jodi explained that a safe word is a word used by an individual in a submissive position when that person wants to stop an event that is taking place. (Tr. at 71.)

4. The government and the defendant agreed prior to trial that, in the interests of protecting Jodi's privacy, they would not ask Jodi to disclose the exact location of her home or current geographical whereabouts. (*See* Tr. of 11/20/07 Tel. Conf., at 196.)

5. Government Exhibit 2C is a binder containing excerpts from the Slavespace website that were admitted into evidence on the sex trafficking and forced labor counts. (*See* Tr. at 80.) These excerpts were taken from an Adobe Acrobat document containing a version

tion, she referred to herself as "pooch" (Govt. Ex. 2C, at 1051), a name given to her by the defendant to signify that she was his property (Tr. at 82.) In relevant part, the petition read: "I am begging to serve you Sir, completely, with no limitations.... If I beg you for my release, Sir, please ignore these words." (Govt. Ex. 2C, at 1051.) Despite this request, however, Jodi believed that she would be able to leave if she wanted to do so, because the defendant had previously told her that he never wanted to have a slave who did not want to serve him. (*See* Tr. at 108.)

In January 1999, Jodi moved to Maryland, where she stayed with Joanna in Joanna's apartment. (*Id.* at 83, 86.) The defendant, who lived in Long Island, New York at the time (*id.* at 75), would visit Joanna's apartment every one to two weeks for three to four days (*id.* at 86–87). During these visits, he would engage in BDSM activities with Jodi, Joanna and sometimes other women. (*Id.*) When the defendant was present, Jodi and any other women present were not allowed to wear clothing, could not eat, drink or speak without permission, were only allowed to sleep for a couple of hours at a time, and were expected to follow the defendant's instructions. (*Id.* at 87.) Soon after Jodi arrived, the defendant took steps to reinforce the notion that he considered Jodi to be his property, including shaving her head and branding a "G" into her buttocks with a coat hanger. (*See id.* at 83–84.) The branded skin subsequently developed into a severe burn, but the defendant did not permit Jodi to seek medical attention. (*Id.* at 86.) The defendant also prohibited Jodi from maintaining any of her prior

friendships and required her to receive permission from him to speak with her family. (*Id.* at 83–84.) He told her that she was ugly, stupid, and disobedient and did not deserve to be his slave. (*Id.* at 87–88.) Jodi called the defendant "sir," while he referred to her as "it," "pooch" or by other derogatory names and expected her to refer to herself only in the third person. (*Id.* at 88.)

The defendant instructed Jodi to engage in a series of BDSM activities with him and other women, which the defendant photographed and posted on a website maintained by Joanna known as "Subspace." (*Id.* at 91–93.) For example, Jodi was whipped, choked, and had sexual intercourse while tied to a wall. (*Id.* at 90.) At the time, Jodi found some of these activities to be sexually gratifying. (*Id.*) She and the other women were required to write diary entries to post on the defendant's website describing the BDSM activities they engaged in with the defendant and expressing the joy and gratitude the "slaves" felt about serving their "master." (*Id.* at 91.)

When the defendant was not present at the apartment, Jodi and Joanna were expected to ensure that each was complying with his instructions. (*Id.* at 93–94.) For example, they were told to recite daily the "Master's Expectations," which outlined the expected conduct of the defendant's slaves. (*Id.* at 94–95; *see also* Govt. Ex. 2C, at 1014–20.) The defendant would also direct Joanna or Jodi to wear butt plugs[6] or breast clamps for long periods of time. (*Id.* at 95.) If either failed to follow in-

---

of the Slavespace website captured by a federal agent in April 2005. (*See* Tr. at 421–23, 431; Govt. Ex. 2A.) At the defendant's request and with the government's consent, the court admitted into evidence the diary entries contained in the binder without instructing the

jury that they were not admitted for their truth. (*See* Tr. 61–68; 100–01.)

6. Jodi described a butt plug as "an implement that's shaped like a penis and inserted in [the] anus." (Tr. at 95.)

structions, the other one would inform the defendant and he would either administer punishments himself or order one to punish the other. (*Id.* at 96.) Jodi was punished nearly every time she saw the defendant, including being whipped or placed in a large, metal dog cage in the apartment. (*Id.* at 97–98.)

Several months after Jodi began living at Joanna's apartment, the punishments inflicted by the defendant became increasingly severe, and Jodi began feeling depressed. (*Id.* at 98.) In June 1999, she burned her arm twice with a cigarette. (*Id.*) Fearing that the defendant would notice the burns when he visited from New York, she told him on the telephone what she had done. (*Id.*) He instructed Joanna to burn herself with a cigarette on her arm and then to punish Jodi by defecating on her face in the bathtub and making her clean the bathtub with her tongue. (*Id.;* Govt. Ex. 2C, at 299, 307.) When the defendant arrived at Joanna's apartment, he slapped Jodi so hard she was "seeing stars." (Tr. at 99.) He then burned her with a cigarette all over her body, including her forehead, arms, the bottom of her feet, the back of her neck, and inside her vagina. (*Id.* at 99–100.) Jodi testified that "I felt like I was literally in hell" and "like I was on fire; I couldn't put it out." (*Id.* at 100.) While Jodi was miserable because she believed she had disappointed the defendant, she continued to remain in the relationship because she believed she could do better and that she belonged with him. (*Id.* at 103.)

### 2. Events from October 1999 to August 2001

At some point, the defendant instructed Jodi to convince her younger sister to travel to Maryland to visit and, when she arrived, to drug her with "ruffies" [7] so the defendant could rape her. (*See id.* at 103–04.) Jodi was also directed to use the internet to recruit a new slave to join them in Maryland. (*Id.* at 104.) Because Jodi refused to complete the first task and was unsuccessful with the second, the defendant told her that, the next time he visited, she would be so severely punished that she might not be able to work for some time afterwards. (*Id.* at 104, 207; Govt. Ex. 31.)

In October 1999, the defendant arrived in Maryland, where he handcuffed Jodi to the wall and told her that he would punish her after he took a nap. (Tr. at 104.) While she was on the wall, Jodi testified that she had a moment of clarity and decided that she wanted to leave. (*Id.* at 104–5.) She told Celia, another woman serving the defendant, and Celia helped her get down. (*Id.* at 105.) Joanna awakened the defendant, who ordered that Jodi be returned to the wall. (*Id.*) When Jodi informed the defendant that she wanted to leave, he told her to shut up. (*Id.*) He then put a whiffle ball inside her mouth, closed her lips shut with surgical needles so that she was unable to speak, and placed a hood over her head. (*Id.* at 105–7.) While she was on the wall, he whipped and beat her with a cane extremely hard for an extended period of time and had sexual intercourse with her. (*Id.* at 106.) The defendant then took Jodi off the wall and attached her with handcuffs to a flat board, at which point he attempted to sew Jodi's vagina closed using a sewing needle and thread, only stopping when the needle broke. (*Id.* at 106–7.) A butt plug was inserted into her anus (Govt. Ex. 2C, at 369, 1223), and the defendant used a knife to carve his initials into the soles of her feet (Tr. at 107). While this incident was

---

7. The term "ruffies" is slang for the drug Rohypnol, which is also known as the "date rape drug." *See U.S. v. Martinez–Martinez,* 369 F.3d 1076, 1078 n. 1 (9th Cir.2004).

taking place, Jodi was crying and screaming. (*Id.* at 107.) The abuse was photographed and Jodi had to write a diary entry about it, and these were placed on the defendant's website. (*See* Tr. at 109; Govt. Ex. 2C at 365–74, 1217–24.) This was the most extreme punishment to which Jodi had ever been subjected. (Tr. at 123.) Prior to this experience, Jodi believed that she would be able to leave any time she wished. (*Id.* at 108.) However, after this episode, Jodi testified that she felt "completely beaten down," "trapped and full of terror." (*Id.* at 108.) She no longer wished to be involved with the defendant and remained with him only out of fear. (*Id.* at 170.)

In November 1999, Joanna told the defendant that she no longer wanted to serve him. (*Id.* at 125.) While both Jodi and Joanna were on the telephone with the defendant, he threatened to send photographs and a videotape of Joanna engaged in sexually explicit behavior to her father and to kill her godson if Joanna did not continue to serve him. (*Id.* at 127–29; *see* Govt. Ex. 12.) As a consequence, Jodi became terrified that, if she attempted to leave the defendant, he would send pictures to her family or harm one of her family members. (Tr. at 128.)

In January 2000, the defendant instructed Jodi to move to New York and stay at the apartment of a woman named Rona, who, Jodi was told, had been his slave since she was 13 years old. (*Id.* at 134.) As Joanna had taken down the Subspace website, the defendant told Jodi to create and manage a new BDSM website entitled "Slavespace." (*Id.*) After creating the website, Jodi worked on it approximately eight to nine hours a day, updating photographs and diary entries and clicking on banner advertisements to increase revenue and enhance its visibility on the internet. (*Id.* at 148–49.) Although she did not want to work on the website, she continued to do so because she was terrified of the consequences if she refused. (*Id.* at 149.) The defendant punished Jodi if she failed to post diary entries or pictures quickly enough or if the website made less money than he expected. (*Id.*) In April 2001, when the defendant was displeased with Jodi's work on the website, he put a safety pin through her labia and attached a padlock to it, closing her vagina. (*Id.* at 150–51.) In an attempt to stop Jodi from screaming and crying during this incident, Rona put a washcloth in Jodi's mouth and the defendant whipped her with a knife. (*Id.*) The defendant photographed this incident and the pictures were placed on the Slavespace website. (*See* Govt. Ex. 2C, at 543, 546–50.)

All revenues made from the website went to the defendant. (Tr. at 153.) The website had a section available exclusively to members, for which fees of approximately $30 per month were charged. (*Id.* at 145, 148.) The defendant made several hundred dollars per month from the member section of the site and an additional several hundred dollars from advertising. (*Id.* at 149–50, 153; Govt. Ex. 23.)

During this period, the defendant continued to punish Jodi severely. For example, he once whipped Jodi so hard that she vomited. (Tr. at 154.) He also held a plastic bag over her head until she passed out. (*Id.* at 155.) In another incident, he zipped Jodi into a plastic garment bag and choked her through the plastic. (*Id.* at 156). Each of these incidents was nonconsensual and each was photographed for the website. (*Id.* at 154–57.) However, Jodi continued to stay with the defendant because she was terrified of his reaction if she left and feared that he might publicly expose her. (*Id.* at 158.) At one point, when she expressed to him how unhappy she was, the defendant threatened to send

photographs of her to her family and the media. (*Id.* at 158–59.)

In March 2001, Jodi called the defendant and told him that she wanted to leave, and he told her that she would first have to endure one final punishment. (*Id.* at 159–60.) Even though she was terrified, she agreed to do so because she feared the consequences if she did not comply. (*Id.* at 159–60.) The defendant drove her to the Long Island residence of a woman named Sherry, instructed her to take off her clothes, and then directed her to go to the basement. (*Id.*) As she was descending to the basement, Jodi realized that she could not go through with the punishment and the defendant forced her to go down the stairs. (*Id.* at 161.) Jodi started to scream and the defendant banged her head against a beam in the basement, bound her hands and ankles and attached her to the beam. (*Id.* at 161–62.) He then beat and whipped her for over an hour. (*Id.* at 162, 165.) While he was beating her, he told her that she belonged to him and needed to serve him. (*Id.* at 165) At various times, he removed the chair or box under her feet so that she was suspended from the ceiling by the ropes. (*Id.* at 162, 164.) He made her take a Valium (*id.* at 164; Govt. Ex. 28) and put a large surgical needle through her tongue (Tr. at 164). Jodi continued to try to scream, even with the needle in her tongue. (*Id.* at 164.) The defendant then left her suspended for half an hour or 45 minutes, until her feet and hands became completely numb. (*Id.* at 165.) After letting her down, he took her to a bedroom and had sexual intercourse with her. (*Id.* at 166.) The defendant photographed Jodi throughout the punishment and forced her to write a diary entry about it to post on his website. (*See id.* at 165–67; Govt. Ex. 2C at 531–34, 536, 538, 540.) Jodi testified that, after this incident, she felt broken and terrified and as if there was no way she would be able to leave the relationship. (Tr. at 168.) She continued to live in Rona's apartment until August 2001. (*Id.* at 172.)

### 3. Events from August 2001 to 2003

In August 2001, Rona communicated to the defendant that she did not want Jodi to live in her apartment any longer, and the defendant allowed Jodi to move out. (*See id.*) When Jodi obtained her own apartment, her interactions with the defendant became less frequent and less extreme. (*Id.* at 173.) However, she continued to stay involved with the defendant in order to maintain a semblance of control over his use of her pictures on the website. (*Id.* at 173, 175.) During this time period, the defendant posted diary entries on the website exposing personal information that Jodi had told him about her family. (*Id.* at 174; Govt. Ex. 2C, at 703–05.) He also posted a "Find Pooch" contest on his website, offering a free membership to any person who photographed her on the street, and he provided information as to Jodi's whereabouts and the location of her apartment. (Tr. at 175, 186; Govt. Ex. 2C, at 3907, 3909.) Jodi maintained contact with the defendant until 2003. (*Id.* at 176.)

### DISCUSSION

### I. Rule 29 Motion

The defendant asks the court to set aside his convictions under Rule 29, contending that (1) the rule of lenity requires that the sex trafficking and forced labor statutes be construed narrowly and, therefore, are inapplicable to the conduct at issue; (2) the sex trafficking statute does not apply when the victim is coerced into pornography as opposed to prostitution; and (3) the evidence is insufficient to show a nexus between the defendant's conduct and the commercial sex act element of the

sex trafficking statute or the labor or services element of the forced labor statute.

## A. Standard of Review

 A defendant seeking a judgment of acquittal on the ground that the evidence was insufficient bears a heavy burden. *United States v. Russo,* 74 F.3d 1383, 1395 (2d Cir.1996). The court must "consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence." *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000). The court must also give deference to the jury's assessment of the credibility of the witnesses and to its selection among competing inferences. *United States v. Pelaes,* 790 F.2d 254, 259 (2d Cir.1986). "The court must be careful to avoid usurping the role of the jury," *Autuori,* 212 F.3d at 114 (citation and internal punctuation omitted), and must not substitute its own determination of credibility or relative weight of the evidence for that of the jury. *Id.* "If the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Id.* (citation and internal punctuation omitted). A conviction challenged on sufficiency grounds will be affirmed if, viewing all the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in its favor, a reviewing court finds that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir.1999) (citation and internal quotation marks omitted).

## B. Applicability of the Trafficking Victims Protection Act to the Conduct for which the Defendant was Convicted

 The defendant invokes the rule of lenity to contest the applicability of the sex trafficking and forced labor statutes to the conduct about which evidence was adduced at trial. As the Supreme Court explained,

> ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.... [W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. This principle is founded on two policies that have long been part of our tradition. First, a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear. Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should. Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.

*United States v. Bass,* 404 U.S. 336, 347–48, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (internal citations and quotation marks omitted). The rule of lenity is only applicable when there is a " 'grievous ambiguity or uncertainty in the language and struc-

ture of the Act.'" *Chapman v. United States*, 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (*quoting Huddleston v. United States*, 415 U.S. 814, 831, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974)).

The statutes at issue here were enacted as part of the Trafficking Victims Protection Act of 2000 ("TVPA"), a sub-section of the Victims of Trafficking and Violence Protection Act of 2000. *See* Pub.L. No. 106–386, 114 Stat. 1464 (2000). In relevant part, the statutes provide as follows:

> *18 U.S.C. § 1589 ("the forced labor statute")*
>
> Whoever knowingly obtains the labor or services of another person ... by threats of serious harm to, or physical restraint against, that person or another person [shall be guilty of a crime.]
>
> *18 U.S.C. § 1591(1) ("the sex trafficking statute")*
>
> Whoever knowingly ... in or affecting interstate or foreign commerce ... recruits, entices, harbors, transports, provides, or obtains by any means a person ... knowing that force, fraud, or coercion ... will be used to cause the person to engage in a commercial sex act [shall be guilty of a crime.]

The defendant makes two principal arguments as to why the court should find that these statutes are ambiguous such that the court should invoke the rule of lenity and set aside his convictions. First, the defendant contends that the TVPA should not apply to "intimate, domestic relationship[s]" like the one at issue here. (Def.'s Mem. 1.) Second, the defendant argues that the application of the sex trafficking and forced labor statutes to BDSM activities renders the statutory language ambiguous. (*See id.* at 17.) For the reasons stated below, the court finds both arguments to be without merit.

### 1. Applicability of the TVPA to Domestic, Intimate Relationships

◼ The defendant relies primarily on the legislative history of the TVPA to make the case that the charged statutes are inapplicable to intimate relationships. According to the defendant, the legislative history demonstrates that these statutes were intended to respond to the "problem of international slave trafficking," which is "a far cry from acts of violence and abuse that take place in the context of an intimate personal relationship." (Def.'s Mem. 14.) On this basis, he claims that his intimate relationship with Jodi renders inapplicable (a) the "labor or services" element of the forced labor statute and (b) the "commercial sex act" element of the sex trafficking statute. The court is not persuaded that the statutory language of either statute is ambiguous such that a resort to the legislative history is appropriate and, moreover, finds that the legislative history fails to support the defendant's reading of the statutory language. Finally, to the extent that there are any ambiguities in the statutory language, the court finds that they are hypothetical only and inapplicable to the instant case.

### (a) Meaning of "Labor or Services" in the Forced Labor Statute

The defendant urges the court to invoke the rule of lenity to narrowly construe the phrase "labor or services" in the forced labor statute on the ground that the phrase is ambiguous in the context of an intimate relationship. According to the defendant, this phrase could be understood to encompass either all forms of work included in the dictionary definition or it could mean only those forms of work for which a person would ordinarily be compensated. The defendant argues that the court should limit the ambit of the statute to labor or services for which compensa-

tion is ordinarily given in order to exclude household chores performed as part of an intimate living arrangement. (Def.'s Mem. 17.) According to the defendant, such a narrow interpretation of the term "labor or services" is required to prevent a wide range of everyday conduct from falling within the reach of the statute.

As the defendant's argument implicitly acknowledges, the plain language of the statute provides no support for his contention. " 'A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.' " *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir.1992) (*quoting Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)). The ordinary meaning of the term "labor" is an "expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory." *Webster's Third New International Dictionary Unabridged* (2002), *available at* http://www.mwu.eb.com; *see also Chapman v. United States*, 500 U.S. 453, 462, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (relying on dictionary definition to determine the ordinary meaning of the term "mixture"). The term "services" is defined as "useful labor that does not produce a tangible commodity." *Webster's Third.* These definitions yield scant support for the defendant's contention that the usual

presence of compensation for the labor or services at issue should be a requirement for a conviction under the forced labor statute. Accordingly, the court finds no ambiguity in the statutory language.

■ In making his claim that the court should limit the types of labor or services that fall within the statute's reach to those for which compensation is ordinarily given, the defendant relies primarily on the TVPA's legislative history. However, in the absence of ambiguity, " '[only] the most extraordinary showing of contrary intentions' in the legislative history will justify a departure from [the statutory] language." *United States v. Albertini*, 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (*quoting Garcia v. United States*, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)). Therefore, courts should only look to legislative history to interpret unambiguous statutes in "rare and exceptional circumstances." [8] *Garcia*, 469 U.S. at 75, 105 S.Ct. 479 (citation and internal quotation marks omitted); *see also United States v. Giordano*, 442 F.3d 30, 40–41 (2d Cir.2006) (finding the rule of lenity and use of legislative history inappropriate when the statute unambiguously reaches the conduct at issue). The court does not find the requisite extraordinary circumstances to be present here.

---

8. The defendant relies on *United States v. Rivera*, 513 F.2d 519, 531–32 (2d Cir.1975), for the proposition that courts may restrict the reach of a criminal statute based on its legislative history even when the statutory language is unambiguous. (*See* Def.'s Mem. 16; Def.'s Reply 4.) However, the defendant's reliance on this case is misplaced, as that portion of *Rivera's* holding was subsequently overturned by *Garcia*, 469 U.S. at 79–80, 105 S.Ct. 479. In *Rivera*, the Second Circuit reviewed a conviction pursuant to 18 U.S.C. § 2114, which prohibits assault of "any person having lawful charge, control, or custody of any mail matter of any money or other property of the

United States." The Second Circuit determined—based primarily on the statute's legislative history—that the statute should be limited to postal-related offenses and not apply to any other form of robbery of government monies. *Rivera*, 513 F.2d at 532. In *Garcia*, the Supreme Court found that § 2114 unambiguously applied to offenses unrelated to the United States Postal Service, concluding that "[p]etitioners seek to clip § 2114 despite its plain terms, but the short answer is that Congress did not write the statute that way." 469 U.S. at 79–80, 105 S.Ct. 479 (citation and internal punctuation omitted).

The defendant argues that the legislative history of the TVPA shows that the statute was only meant to proscribe conduct that compels the victim to provide labor or services "for a business purpose." (Def.'s Reply 3.) However, the court finds no justification for this contention. While the legislative history of the TVPA undoubtedly focuses primarily on the need to combat international sex trafficking, the Congressional purpose and findings of the TVPA make clear the intended broad scope of the legislation. The stated purpose of the TVPA is "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *See* § 102(a), 114 Stat. at 1466. Among the Congressional findings are the following:

(3) Trafficking in persons is not limited to the sex industry. This growing transnational crime also includes forced labor and involves significant violations of labor, public health, and human rights standards worldwide.

(4) . . . Traffickers lure women and girls into their networks through false promises of decent working conditions at relatively good pay as nannies, maids, dancers, factory workers, restaurant workers, sales clerks, or models. Traffickers also buy children from poor families and sell them into prostitution or into various types of forced or bonded labor.

. . .

(6) Victims are often forced through physical violence to engage in sex acts or perform slavery-like labor. Such force includes rape and other forms of

sexual abuse, torture, starvation, imprisonment, threats, psychological abuse, and coercion.

§ 102(b), 114 Stat. at 1466–67. While the court observes that Congress did not expressly indicate its desire to regulate labor or services performed within the household, the legislative history provides no cause to believe that Congress intended that type of labor to be excluded from the legislation's reach. In fact, the conference report on the TVPA expressly indicates the intention of Congress that § 1589 be used to regulate such conduct, emphasizing that:

it is intended that prosecutors will be able to bring more cases in which individuals have been trafficked into domestic service, an increasingly common occurrence, not only where such victims are kept in service through overt beatings, but also where the traffickers use more subtle means designed to cause their victims to believe that serious harm will result to themselves or others if they leave, as when a nanny is led to believe that children in her care will be harmed if she leaves the home.

H.R. Conf. Rep. 106–939, 106th Cong. (Oct. 5, 2000). Moreover, while the legislative history does not address situations where traffickers have intimate relationships with their victims, the court's survey of the TVPA's legislative history reveals no expressed intention to preclude criminal liability in those contexts.[9] Accordingly, the court follows the Supreme Court in *Smith v. United States*, 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), and concludes that, "[h]ad Congress intended the narrow construction [the defendant] urges, it could have so indicated. It did not, and

**9.** It appears as though reading such a requirement into the statute may also decrease the effectiveness of the statute in combating trafficking. For example, according to the gov-

ernment, the majority of prosecutions for sex trafficking in this district involve men who have forced their wives or girlfriends to engage in prostitution. (Govt.'s Resp. 27 n. 13.)

we decline to introduce that additional requirement on our own." *Id.* at 229, 113 S.Ct. 2050.

The defendant relies on *United States v. Kozminski,* 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988), for the proposition that the court should invoke the rule of lenity in order to avoid an unduly broad interpretation of the statute. (*See* Def.'s Reply 4–6.) *Kozminski* involved the convictions of three family members on charges that they had participated in the abduction of two mentally retarded men and then coerced them to work for up to 17 hours a day, seven days a week, initially for $15 per week, and later for no pay. 487 U.S. at 934–35, 108 S.Ct. 2751. The Supreme Court held that the term "involuntary servitude" in 18 U.S.C. § 241 and 18 U.S.C. § 1584 should be construed narrowly to exclude the use of psychological coercion to compel an individual into working. 487 U.S. at 809, 108 S.Ct. 2667. The Court found that extending the reach of those statutes beyond physical or legal coercion "would appear to criminalize a broad range of day-to-day activity," and "fail[s] to provide fair notice to ordinary people who are required to conform their conduct to the law." *Id.* Because the district court's instruction on the definition of "involuntary servitude" could have been interpreted to include the exercise of psychological coercion, the Supreme Court reversed the convictions and ordered a new trial. *Id.* at 811, 108 S.Ct. 2667.

*Kozminski* does not compel the court to adopt the defendant's interpretation of the statute. In fact, the TVPA's legislative history makes clear that Congress enacted § 1589 as a response to the Supreme Court's decision in *Kozminski.* In its findings on enacting the TVPA, Congress observed:

> Involuntary servitude statutes are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion. In *United States v. Kozminski,* 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988), the Supreme Court found that section 1584 of title 18, United States Code, should be narrowly interpreted, absent a definition of involuntary servitude by Congress. As a result, that section was interpreted to criminalize only servitude that is brought about through use or threatened use of physical or legal coercion, and to exclude other conduct that can have the same purpose and effect.

§ 102(b)(13), 114 Stat. at 1467. The conference report on the TVPA further clarifies that: "Section 1589 will provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski.*" H.R. Conf. Rep. No. 106–939; *see also United States v. Bradley,* 390 F.3d 145, 150 (1st Cir.2004) ("section 1589 was intended expressly to counter [*Kozminski* ]"). Thus, in passing the TVPA, Congress made clear its intent that this statute be applied broadly in order to capture conduct that the Supreme Court had ruled beyond the reach of the statutes prohibiting involuntary servitude. Of course, the quoted language primarily reflects Congress' intention that the "serious harm" provision of § 1589 be interpreted expansively. Yet, the court also finds this history to be a persuasive indication that courts should be cautious about reading into this statute additional requirements not compelled by either the statute's plain language or its legislative history.

The defendant additionally points to *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) to support his argument that it is appropriate to narrowly construe an unambiguous statute in order to avoid bringing an overly

broad range of conduct within the scope of federal law. However, *Williams* is clearly distinguishable from the instant case. *Williams* concerned the issue of whether knowingly depositing a check not supported by sufficient funds constituted a "false statement" in violation of 18 U.S.C. § 1014. The Supreme Court observed that this interpretation of the statute ran contrary to its literal meaning because "a check is not a false assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Williams,* 458 U.S. at 284, 102 S.Ct. 3088. The *Williams* court acknowledged that the government's argument to the contrary was plausible but emphasized that it "slights the wording of the statute." *Id. (quoting United States v. Enmons,* 410 U.S. 396, 399, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973)). Given that the government's suggested interpretation also lacked support in the statute's legislative history and would greatly expand federal criminal liability, the Supreme Court held that depositing bad checks did not constitute a violation of § 1014. *Id.* at 290, 102 S.Ct. 3088. In so holding, the Court stressed that the statute is "not unambiguous" and "both readings ... are plausible." *Id.* In contrast, the forced labor statute is unambiguous and the text yields no support for the defendant's interpretation.

Further, the court is unconvinced that relying on the ordinary meaning of "labor or services" would unduly broaden the statute's reach. As an example of the potential ramifications of relying on the dictionary definition, the defendant explains that such an interpretation would enable a conviction under the statute if a couple jointly operated a bed and breakfast and their relationship became abusive. (Def.'s Mem. 18.) The defendant argues that, while work performed in relation to the operation of the bed and breakfast or performance of household chores could be considered labor, the statute should not be interpreted to proscribe coerced conduct of this nature. (Def.'s Mem. 18.) The court disagrees. Contrary to the defendant's argument, interpreting the terms "labor" and "services" in light of their ordinary, everyday meaning would not extend federal criminal liability to abusive domestic relationships more generally because § 1589 requires a link between the physical restraint or threats of serious harm and the obtaining of labor or services. Using the defendant's examples, if one spouse uses the means proscribed by the statute to coerce his spouse into performing domestic chores or tasks related to the operation of the bed and breakfast, a trier of fact would be able to find a violation of the forced labor statute. The court sees no reason why the existence of a domestic partnership between two individuals should preclude criminal liability if one person knowingly uses "threats of serious harm to, or physical restraint against, that person or another person," to obtain labor or services.[10] *See* § 1589.

█ Finally, the defendant's arguments on this claim are purely hypothetical, as the labor or services at issue in the instant

---

**10.** The defendant also quotes the government's somewhat ambiguous statement at trial that "a factual situation that looks like rape" might fall within the reach of the forced labor statute. (*See* Tr. at 1439–40.) The defendant argues that this statute was never intended to be used to prosecute rape and should not be interpreted in a manner that would enable the government to do so. The court recognizes that, in certain circumstances, a sexual act may constitute a labor or service. However, the court fails to see how the forced sexual act endured by a rape victim falls within the ordinary meaning of the phrase "labor or services," as defined by the court in this opinion. Accordingly, the court sees no danger that this statute will be unduly broadened to accommodate prosecutions for rape.

case fall within the defendant's proposed definition of the terms. Based on the evidence presented at trial, the tasks Jodi performed at the defendant's behest are not household chores but rather labor or services that would, in fact, ordinarily have been compensated. For example, the jury asked the court to clarify whether the following acts could fall within the meaning of labor in the forced labor count: "setting up and maintaining websites, writing diaries, posing for pictures, HTML coding, clicking ads, recruiting services of other trainees, [and] commercial sex acts." (Tr. at 1428; Ct. Ex. 20.) As outlined in the court's recitation of the facts, the evidence suggests that Jodi engaged in each of these acts and that the defendant profited from displaying the fruits of her labor on the Slavespace website. The defendant has provided no reasoned explanation why these acts should be excluded from the reach of the phrase "labor or services" in § 1589, and the court finds none.

#### (b) Meaning of "Commercial Sex Act" in the Sex Trafficking Statute

■ The defendant additionally contends that the meaning of the term "commercial sex act" in 18 U.S.C. § 1591 is ambiguous because it "may be deemed to include all sexual behavior provided that the defendant somehow profits from it; or, it may be limited to sexual conduct which falls outside the scope of the intimate relationship between the defendant and the complainant." (Def.'s Mem. 17.) The court finds this argument nonsensical, as the statute's plain language refutes the former interpretation. Section 1591 proscribes trafficking a person knowing that "force, fraud, or coercion ... will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). The statute defines a commercial sex act as "any sex act, on account of which any-

thing of value is given to or received by any person." *Id.* § 1591(c)(1). So, while a commercial sex act is quite broadly defined in the statute, the requirement that it be a product of force, fraud or coercion precludes the potential broad sweep about which the defendant expresses concern. As will be discussed below, *see infra* Section I(D)(1), the government has presented sufficient evidence to show that the commercial sex acts at issue here were not a product of an intimate relationship but, rather, were obtained through force, fraud or coercion.

■ For these reasons, the court rejects the defendant's contention that his conviction should be overturned because the TVPA was never meant to regulate conduct that occurs within a domestic, intimate relationship. The court finds that, as long as the evidence is sufficient to establish that the required elements of each statute are present, the mere existence of a past or present domestic, intimate relationship should not preclude conviction.

#### 2. Applicability of the TVPA to BDSM Conduct

The defendant argues that various aspects of the statutes at issue become ambiguous when applied to a BDSM relationship. The court finds that any ambiguities in the statutes were already resolved in the defendant's favor at trial and, therefore, a judgment of acquittal on these grounds is unwarranted.

#### (a) Meaning of "Physical Restraint" and "Serious Harm" in the Forced Labor Statute

■ The defendant contends that the terms "physical restraint" and "serious harm" in the forced labor statute become ambiguous when applied to BDSM conduct because threats of serious harm and physi-

cal restraint may be part of a consensual BDSM relationship. (Def.'s Mem. 17.) However, the defendant raised these concerns in his objections to the government's proposed jury instructions, and the court construed the statute narrowly in order to explicitly exclude consensual BDSM conduct. Accordingly, the court instructed the jury:

> Throughout the trial, you have heard evidence about sexual practices called Bondage, Discipline/Domination, Submission/Sadism, Masochism, or "BDSM," that may involve actual physical restraint, such as being tied up or placed in a cage. The mere fact that a person was physically restrained during the course of such acts does not necessarily mean that the statute was violated. For example, if the physical restraint was consensual, then it would not constitute a violation of the statute. It is for you to decide, based on a careful consideration of all the facts and surrounding circumstances, whether the acts of physical restraint violated the statute.

(Jury Charge, Dkt. No. 202 [hereinafter "Jury Chg."] 21, 17.) With regard to "threats of serious harm," the court referred the jury to the definition given in the court's instruction on sex trafficking, where the court instructed the jury that "the threats must be improper and must involve consequences that are sufficient, under all the surrounding circumstances, to compel or coerce the victim into engaging in a commercial sex act that the victim would not otherwise have willingly engaged in." (*Id.* at 21, 16.) Thus, the court has already adopted the construction of the statute currently urged by the defendant in his motion for a judgment of acquittal. As will be discussed below, *see*

*infra* Section I(D)(2), the evidence is sufficient to support the defendant's forced labor conviction when the statute is construed in a manner that excludes consensual BDSM conduct from its reach.

**(b) Meaning of "Force" and "Coercion" in the Sex Trafficking Statute**

 With respect to the sex trafficking statute, the defendant similarly contends that the terms "force" and "coercion," when given their ordinary meaning, may encompass consensual BDSM conduct. (Def.'s Mem. 17.) Again, the court agrees with the defendant that it is appropriate to construe these terms narrowly to avoid criminalizing consensual conduct. In the court's instructions to the jury, the court defined the term "coercion" as "threats of serious harm to or physical restraint against any person, or any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person." (Jury Chg. 16.) The court defined the terms "physical restraint" and "threats of serious harm" in the same manner described in the previous section, which explicitly excluded consensual conduct. (*See id.*)

 The court observes that the term "force" was defined more broadly in the jury instructions, as "any form of violence, compulsion or constraint exercised upon another person in any degree." (*Id.*) However, this definition was followed in the same section by the court's explicit instruction that physical restraint as part of consensual BDSM conduct would not constitute grounds for a conviction under the statute (*see id.* at 17), a caveat that should have cured any ambiguity about the statute's scope vis-á-vis consensual conduct.[11]

---

**11.** The court also notes that, in the course of

defining the elements of aggravated sexual

In any event, for the purposes of the defendant's sufficiency challenge, *see infra* Section I(D)(1), the court will only consider applications of force that the government presented sufficient evidence to show were non-consensual.

### (c) Meaning of "Includes" in the Aggravating Element of the Forced Labor Statute

▮▮▮▮▮ In addition, the defendant contends that the relationship of the aggravating element of aggravated sexual abuse to the violation of the forced labor statute is ambiguous. (Def.'s Mem. 17.) The forced labor statute provides a statutory aggravating element when "the violation [of the statute] includes ... aggravated sexual abuse." 18 U.S.C. § 1589. According to the defendant, it is unclear whether any non-consensual sexual conduct in the course of BDSM activities is sufficient to satisfy this element or whether such conduct must be undertaken in order to obtain the labor or services at issue. While the court recognizes that, in other cases, a broader interpretation of the aggravating element may be appropriate, the court construed this element quite narrowly in its jury charge. The court instructed the jury that "the government must prove that the defendant obtained the labor and services of Jodi through the use of, in whole or in part, ... aggravated sexual abuse." (Jury Chg. 25.) The court finds that this definition makes clear the requisite nexus between the aggravated sexual abuse and the violation of the statute. The defendant does not argue that there was insufficient evidence to enable the jury to find that the conduct at issue fit within the court's more narrow construction of the statutory ag-

### C. Photographs of Sex Acts as "Commercial Sex Acts" under the Sex Trafficking Statute

Next, the defendant claims that the government failed to establish that Jodi engaged in a "commercial sex act" within the meaning of the sex trafficking statute because the commercial gain resulted from the depiction of sex acts rather than from the acts themselves. Essentially, the defendant's interpretation of the term "commercial sex act" would limit the purview of the statute to prostitution and exclude pornography. The court finds no support for this contention. As explained above, *see supra* Section I(B)(1)(b), the statute broadly defines a commercial sex act as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(c)(1). The statutory language provides no basis for limiting the sex acts at issue to those in which payment was made for the acts themselves; rather, the use of the phrase "on account of which" suggests that there merely needs to be a causal relationship between the sex act and an exchange of an item of value. If Congress had intended to limit the commercial sex acts reached by the statute to prostitution, it could have easily drafted the statute accordingly.

The court's more expansive understanding of the term is supported by the statute's purpose, which was to protect individuals from being victimized by trafficking. In particular, the Congressional findings in the TVPA include the recognition that "[t]he sex industry has rapidly expanded over the past several decades.

---

abuse, a statutory aggravating factor of the forced labor statute, the court instructed the jury that "the application of force with the

consent of the recipient in the context of BDSM activities would not violate the statute." (Jury Chg. 24.)

It involves sexual exploitation of persons, predominantly women and girls, involving activities related to prostitution, pornography, sex tourism, and other commercial sexual services." § 102(b)(2), 114 Stat. at 1466. The findings also noted the lack of a "comprehensive law ... that penalizes the range of offenses involved in the trafficking scheme." § 102(b)(14), 114 Stat. at 1467. As the government points out, construing the commercial sex acts included within the ambit of the statute broadly focuses the trier of fact's inquiry on whether a given individual has been sexually exploited for profit, rather than on whether traffickers profited directly or indirectly from the exploitation, and is therefore more consistent with the statute's purpose. (*See* Govt.'s Resp. 17.)

In the absence of any ambiguity in either the statutory language or the legislative history, the court finds that a narrow construction of the statute restricting its reach to prostitution is unwarranted. Accordingly, the court concludes that, for purposes of criminal liability under the sex trafficking statute, a commercial sex act may include sexual acts that are photographed for commercial gain. The defendant has not contested that he derived financial benefit from photographs of Jodi engaging in sex acts as defined in the jury charge [12]—indeed, the Slavespace website is replete with them (*see, e.g.*, Govt. Ex. 2C, at 522, 525–28, 1223, 1830–35, 1846–49, 1852–69, 2557–2565, 3956)—and, therefore,

no further review of the sufficiency of the evidence in this regard is required.

**D. Sufficiency of the Evidence with Regard to the Nexus between the Defendant's Abuse of the Victim and a Commercial Sex Act or Labor and Services**

The defendant makes two additional arguments as to why the evidence is insufficient to support his conviction: (1) the government failed to establish a sufficient nexus between the defendant's conduct and the commercial sex acts at issue; and (2) the evidence does not show a link between the defendant's abuse of Jodi and the labor and services provided by Jodi. According to the defendant, the evidence establishes, at best, only that the defendant forced Jodi to continue a sexual relationship with him against her will but not that his abuse was intended to cause her to engage in a commercial sex act or to provide labor or services. (Def.'s Mem. 21–22). The defendant analogizes the instant case to one in which a husband sexually assaults his wife and explains, "[j]ust as the husband's act of sexual assault is not designed to compel his wife to perform the domestic services that are incidental to most marriages, such as the cooking, shopping and cleaning, the defendant's acts of violence were not designed to compel the complainant's services on his website." (*Id.* at 22.) For the reasons stated below, the court dismisses these claims.

---

**12.** The jury charge defined sex act as:
(A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;
(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; or
(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.
(Jury Chg. 17–18.)

### 1. Nexus between the Defendant's Conduct and a "Commercial Sex Act" under the Sex Trafficking Statute

 As the court instructed the jury, the government was required to prove three elements beyond a reasonable doubt in order for the jury to find the defendant guilty of sex trafficking in violation of 18 U.S.C. § 1591. The government had to prove that: (1) the defendant engaged in a prohibited trafficking activity; (2) the defendant's trafficking activity affected interstate commerce; and (3) the defendant knowingly used force, fraud or coercion to cause the trafficked individual to engage in a commercial sex act. (Jury Chg. 13–14.) The defendant submits that the government failed to establish the third element of this offense, because the evidence is insufficient to show a relationship between the force, fraud, or coercion employed by the defendant and the commercial sex acts at issue. The court finds the defendant's argument in this regard unpersuasive.

There are at least two instances in which a reasonable jury could have found, based on the evidence presented at trial, that the defendant's non-consensual application of force directly caused Jodi to engage in a commercial sex act. First, in October 1999, after Jodi communicated to the defendant that she wanted to leave him, he beat her severely and then, while Jodi was handcuffed to a board with a whiffle ball in her mouth and needles through her lips, he ordered Joanna to insert a butt plug in Jodi's anus. (*See* Tr. at 105–07; Govt. Ex. 2C, at 368–70.) Because the photograph of Jodi bound and gagged with the butt plug inserted was posted on the Slavespace website (*see* Govt. Ex. 2C, at 374, 1223) and the defendant received revenue from this site (*see* Tr. at 149–50, 153; Govt. Ex. 23), a jury could find that this act constitutes a commercial sex act as defined in the previous section. Jodi's testimony that she had just told the defendant she wanted to leave, that she was screaming and crying throughout the incident, and that she was physically restrained is more than sufficient to allow a reasonable jury to draw the inference that the defendant used force to cause her, in whole or in part, to engage in this act.

Second, in January 2001, while Jodi's hands were tied with rope, the defendant pierced Jodi's labia with a safety pin and attached a padlock to it (*see* Tr. at 150–51), and a series of photographs depicting this incident were placed on the website (*see* Govt. Ex. 2C, at 546–51, 1846–59.) A reasonable jury would have been able to draw the conclusion that this constitutes a commercial sex act as previously defined. The jury would also be able to reasonably infer that the defendant's use of force caused Jodi to engage in this act, based on Jodi's testimony that this incident took place during the time period that she was with the defendant non-consensually, that she was bound, that a wash cloth was put in her mouth to silence her screaming, and that the defendant whipped her with a knife to keep her from crying. In addition, the photographs of Jodi's face during the incident, in which she appeared to be screaming and experiencing pain (*see id.* at 1840–43), further support the reasonableness of such an inference.

More generally, the evidence presented at trial was also sufficient to support the inference that the defendant's use of force, fraud and coercion to prevent Jodi from leaving were not only aimed at preserving their sexual relationship but also intended to maintain her services as a model for his commercial website. Evidence was presented at trial that, on two separate occasions—in October 1999 and March 2001—Jodi told the defendant she wanted to

leave the relationship and he severely punished her. (*See* Tr. at 104–09; 159–68.) Jodi testified that, after both of these experiences, she was unable to leave the defendant because she was terrorized with fear. (*See* Tr. at 108, 168, 170.) On the basis of this evidence, a jury could find that the defendant's use of force on these occasions served as a threat of serious harm to Jodi should she try to leave in the future and, thereby, constituted coercion.

The jury could have also reasonably concluded that the defendant used non-physical threats to coerce Jodi into maintaining her relationship with the defendant. In particular, Jodi testified that, when she expressed her unhappiness in the relationship and broached the subject of leaving, the defendant threatened to send sexually explicit pictures to her family and the media. (*See* Tr. at 158–59.) Given Jodi's testimony that Jodi was on the telephone when the defendant threatened to kill Joanna's godson and send pictures to Joanna's family, the defendant's threats to Joanna could also be interpreted as intended to coerce Jodi into staying.

The evidence further suggests that Jodi's services as a model on the defendant's website were an important part of their relationship. Jodi's testimony and the binder of excerpts from the Slavespace website indicate that significant numbers of the encounters between Jodi and the defendant were photographed and placed on the site. The government presented evidence that, aside from the Slavespace website, the defendant's only other sources of income during the relevant time period were the women serving him, sales of a small number of comic books, and revenue from another website he owned that was eventually shut down. (*See* Tr. at 212, 437–38.) Thus, the jury could infer that it was important to the defendant to maintain the several hundred dollars a month earned in membership and advertising revenues from Slavespace. This impression is reinforced by the defendant's statement to Jodi in November 1999 to the effect that he did not want to hear anything from "it" "except how my site is doing." (Govt. Ex. 30, at 1.) Further, Jodi testified that the defendant demonstrated an active interest in the site and its earnings, monitoring the site daily and checking on the membership and advertisement revenues earned and the website's popularity ratings. (*See* Tr. at 401.) Based on this evidence, it would be reasonable to infer that the defendant sought to perpetuate his relationship with Jodi—at least in part—to photograph her BDSM activities, including those that constitute sex acts, in order to place them on his website and earn revenue from them.

The defendant argues that the existence of a prior consensual relationship between the defendant and Jodi in which the infliction of punishment and pain was part of their mutual sexual gratification makes it impossible to determine whether the defendant abused Jodi to compel the performance of a commercial sex act. He argues that the violence inflicted could also have been for purely sexual pleasure or as a means to reinforce their previously agreed-upon roles in the relationship. (Def.'s Reply 6.) The court acknowledges that the issue of whether the government proved beyond a reasonable doubt that the defendant used non-consensual force, fraud or coercion to cause Jodi to engage in a commercial sex act is difficult and complicated. However, this was precisely the question that the jury was charged with resolving (*see* Jury Chg. 16), and the evidence was adequate to support its conclusion. The existence of other potential motivations for the defendant's behavior does not alter the court's determination in this regard.

## 2. Nexus between the Defendant's Conduct and "Labor or Services" under the Forced Labor Statute

A conviction of forced labor under 18 U.S.C. § 1589 required the government to prove beyond a reasonable doubt that (1) the defendant obtained the labor or services of another person; (2) the defendant did so by using either (a) threats of serious harm to, or physical restraint against, that person or any other person; or (b) a scheme, plan or pattern intended to cause the person to believe that non-performance would result in serious harm to, or physical restraint against, that person or any other person; and (3) the defendant acted knowingly. (Jury Chg. 19–20.) The court instructed the jury that the government was not required to link specific threats or actions taken against Jodi to particular labor tasks she performed. (*See* Jury Chg. 22.) Instead, the government needed to establish that there was a connection between the threats made or physical restraint by the defendant and the labor and services she rendered. (*Id.*) Thus, the government could satisfy the second element by showing a connection between punishments imposed by the defendant and the labor or services at issue or a climate of fear that was sufficient to cause her to perform labor or services against her will. (*Id.*) The defendant argues that the government's evidence was insufficient because the punishments imposed by the defendant were part of his intimate relationship with Jodi and were unconnected with obtaining her labor or services on the website. This argument is meritless.

Based on Jodi's testimony, the jury could have reasonably found the requisite connection between punishments imposed by the defendant and her provision of labor and services on the website. Jodi explained that the defendant punished her when she did not upload diary entries or photographs to the website as quickly as the defendant wanted or when the website was not making enough money to please the defendant. (Tr. at 149). When asked to identify the most severe punishment she recalled related to her work on the website, she recounted the April 2001 incident in which the defendant pierced her labia with a safety pin. (*Id.* at 150–51.) Even though Jodi did not detail precisely what she had done to incur this punishment, the jury could still reasonably believe that this incident was connected to her tasks on the Slavespace website. The ability of a fact finder to reasonably presume that the defendant's punishments compelled Jodi's work on the website is buttressed by her testimony that she only worked on the website because she knew she would be severely punished if she refused. (*See id.* at 149.) Thus, a reasonable jury could find that the defendant obtained Jodi's labor on his website through a persistent pattern of punishing her when he was dissatisfied with her work.

The defendant claims that the evidence is insufficient to support a connection between the punishments and Jodi's labor on the website based on Jodi's testimony that she was "always being punished" for being disobedient and could be punished "for no reason at all." (*Id.* at 207.) According to the defendant, the only reasonable inference that could be drawn is that the defendant's punishments were sexual in nature and intended only to reinforce his status in their BDSM relationship. (Def.'s Mem. 23.) However, that the defendant would, at times, randomly punish Jodi does not prevent a fact finder from crediting Jodi's testimony that there was, on other occasions, a direct connection between the punishments he inflicted and Jodi's performance with regard to the website. Moreover, the occasional randomness of the violence could reasonably be interpret-

ed as an attempt to enhance Jodi's fear of being punished and her desire to minimize instances where she provoked the defendant's anger.

The evidence also suffices to establish that the defendant's actions to maintain Jodi in a relationship with him were aimed at compelling her to provide labor and services. As described above, *see supra* I(D)(1), it would be reasonable to believe that the defendant knowingly used force and coercion to maintain a non-consensual relationship with Jodi from October 1999 to August 2001. Based on the evidence presented by the government, the defendant also employed force and coercion in an attempt to maintain his relationship with Joanna, who maintained the Subspace website. When his efforts were unsuccessful, the defendant became reliant on Jodi to create and maintain the Slavespace website, and she devoted a significant amount of time daily to this task. Based on the economic importance of the website to the defendant, as previously described, *see supra* I(D)(1), a reasonable jury could conclude that the defendant kept Jodi in a relationship against her will in order to obtain her labor on his site.

Accordingly, the defendant's Rule 29 motion is denied. While this case undoubtedly presents a novel application of the forced labor and sex trafficking statutes, the evidence at trial was sufficient to show that defendant's conduct fell within the plain language of the statutes. To the extent that the BDSM conduct at issue created any ambiguities in interpreting the evidence, the court construed the statute in the defendant's favor. The defendant has failed to persuade the court that the TVPA's legislative history or any other factor merits setting aside the defendant's conviction.

## II. Rule 33 Motion

In the alternative, the defendant argues that the court should order a new trial so that the jury can be instructed that it must find that the defendant's "dominant purpose" in employing force or coercion was to obtain a commercial sex act or labor or services in order to convict under the sex trafficking statute and the forced labor statute, respectively. The defendant continues to express the concern that he was convicted for sexual conduct within an intimate relationship and emphasizes that the BDSM conduct at issue likely complicated the jury's interpretation of the legal elements of the statutes. (*See* Def.'s Mem. 24.) For the reasons stated below, the defendant's motion is denied. The court determines that the defendant has failed to provide a sufficient basis for importing such a "dominant purpose" requirement into the statutes. Further, given the evidence presented at trial, the court is persuaded that a commercial purpose sufficiently animated the defendant's conduct towards Jodi that the existence of any additional motives for the behavior leading to his conviction does not satisfy the requirements of Rule 33.

### A. Standard of Review

Rule 33 provides that a court may vacate a judgment and grant a new trial "if justice so requires." The discretion granted under the rule is broad, but far from unfettered, and the relief available under the rule is to be granted "with great caution and in the most extraordinary circumstances." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir.2001). "There must be a real concern that an innocent person may have been

convicted." *Sanchez*, 969 F.2d at 1414. In exercising its discretion under Rule 33, "the court is entitled to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Id.* at 1413 (citation and internal quotation marks omitted.)

## B. Defendant's Claim that a Conviction Requires the Jury to Find that the "Dominant Purpose" of the Force or Coercion was to Obtain the Commercial Sex Act or Labor or Services

With respect to the sex trafficking statute, the court instructed the jury that a conviction required the government to prove that "the trafficking activity was undertaken for the purpose of causing a person to engage in a commercial sex act." (Jury Chg. 17.) Similarly, the court instructed the jury that a conviction under the forced labor statute required the government to prove that the defendant used threats or employed prohibited actions "for the purpose of obtaining labor or services." (*Id.* at 23.) While the defendant did not contest these instructions at trial,[13] he now argues that a new trial is warranted so that the jury may be tasked with determining whether obtaining the commercial sex act or labor or services was a "dominant purpose" of the defendant's use of coercion or threats. (Def.'s Reply 7–9.)

The defendant relies on *United States v. Sirois*, 87 F.3d 34 (2d Cir.1996), and *United States v. Miller*, 148 F.3d 207 (2d Cir. 1998), for the proposition that the court should have instructed the jury that a conviction required it to find that one of the dominant purposes of the defendant's actions was to force Jodi to engage in the conduct at issue. In *Sirois*, the Second Circuit reviewed the district court's jury charge with respect to 18 U.S.C. § 2251(a). Section 2251(a) proscribes a variety of conduct done with "the intent that [any] minor engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct" in interstate or foreign commerce. In *Sirois*, the district court had instructed the jury that, in order to convict the defendant, "it is not necessary for the government to prove ... that illegal sexual activity, or visual depiction of that activity, was the sole or even the dominant purpose of the minors being transported. It is enough if the evidence shows that the illegal sexual activity was one of the dominant purposes of the trip." 87 F.3d at 39. On appeal, Sirois argued that the jury should have been instructed that the statute required a finding that the production of visual depictions of illegal sexual activity constituted the sole dominant purpose of the transportation. *Id.* The Second Circuit rejected this argument, finding that the jury could convict under the statute so long as the evidence showed that such an end "was one of the dominant motives for the interstate transportation of the minors, and not merely an incident of the transportation." *Id.* In *Miller*, the Second Circuit reaffirmed convictions under 18 U.S.C. § 2422 and 18 U.S.C. § 2423(a), which prohibit, respectively, coercing travel and transporting minors, when such activities are undertaken with the intent that the victim engage in prostitution or other criminal sexual activity. *See* 148 F.3d at 207. The *Miller* court upheld the district court's charge to the jury, which tracked the above-referenced charge in *Sirois*, and rejected a similar challenge that the proscribed activity had to be the sole dominant purpose of the defendant's conduct. *See Id.* at 211–12.

---

**13.** In fact, the defendant suggested the language quoted with respect to the forced labor statute. (*See* Tr. of 2/7/07 Tel. Conf., at 36–37.)

Those cases are insufficient to persuade the court that the requisite extraordinary circumstances are present mandating a new trial. Not only do *Sirois* and *Miller* interpret statutes different from those at issue here, but the Second Circuit never addressed the issue presently before the court, namely whether the district court was required to instruct the jury that the prohibited activity had to be a dominant purpose of the defendant's conduct. Further, the language of the sex trafficking and forced labor statutes do not suggest such a requirement, nor is the defendant able to point to any language in the legislative history suggesting that the reach of the statutes should be limited in this manner.

■ Finally, the court is not convinced that a manifest injustice would result in the absence of a new trial. The defendant makes a valiant attempt to depict his conduct as, at worst, domestic violence and to paint any commercial aspects as merely incidental to what was really an intimate relationship. However, such a characterization vastly understates the role that the defendant's website appeared to play in his relationship with Jodi. Jodi testified about a wide variety of intimate conduct between her, the defendant, and other women that was photographed and displayed, for a fee, on the defendant's website. Moreover, based on her testimony, she was forced to describe this conduct—in minute detail—for posting on the website, and she was also made to spend eight or more hours a day updating the website and clicking on banner advertisements. Meanwhile, according to Jodi, the defendant monitored her work daily, punished her when her performance was not up to par and collected all of the proceeds of her labor on the website. The defendant has provided no reason why the court should question the jury's apparent determination that Jodi was a credible witness, and the court finds none. After a close review of the evidence presented at trial, the court finds the commercial aspects to be sufficiently pervasive in the non-consensual portion of the relationship between Jodi and the defendant that a new trial on these grounds is not warranted. Accordingly, the defendant's Rule 33 motion is denied.

### CONCLUSION

For the reasons given above, the defendant's motions for a judgment of acquittal pursuant to Fed.R.Crim.P. 29 and for a new trial under Fed.R.Crim.P. 33 are denied.

SO ORDERED.