UNITED STATES of America,
Appellee,

v.

James V. MONACO, Mary E. Monaco, aka Mary Young, David J. Monaco, Linda DeMaio, and Michael DeMaio, aka Mickey, Defendants–Appellants.

No. 932, Dockets 98–1386, 98–1387, 98–1399, 98–1400, 98–1401.

United States Court of Appeals, Second Circuit.

Argued: May 3, 1999.

Decided: Oct. 21, 1999.

Jeremiah Donovan, Old Saybrook, CT, for Defendant–Appellant James V. Monaco.

William T. Koch, Jr., Lyme, CT, for Defendant–Appellant Mary E. Monaco.

Suzanne L. McAlpine, New Haven, CT (Hugh F. Keefe, Lynch, Traub, Keefe &

Errante, on the brief), for Defendant–Appellant David J. Monaco.

Jon L. Schoenhorn, Hartford, CT (Schoenhorn & Associates, on the brief), for Defendants–Appellants Linda and Michael DeMaio.

Mark G. Califano & Jeffrey A. Meyer, Assistant United States Attorneys, New Haven, CT (Stephen C. Robinson, United States Attorney for the District of Connecticut, on the brief), for Appellee.

Before: WINTER, Chief Judge, JACOBS, Circuit Judge, and SWEET,[1] District Judge.

JACOBS, Circuit Judge:

The five appellants, all related by blood or marriage, were convicted after a jury trial in the United States District Court for the District of Connecticut (Thompson, *J.*) of various money-laundering offenses. At trial, the government demonstrated that over the course of many years the group had laundered money for another family member, Jimmy Monaco, a Florida-based drug trafficker and pirate. Among other actions, family members stored Jimmy's assets, keeping them available to meet his expenses, and acted as nominee owners of his real and personal property.

On appeal, appellants raise numerous challenges to their convictions and sentences, most of which are rejected in an unpublished summary order also released today. *See United States v. Monaco*, 1999 WL 980946 (2d Cir. Oct. 21, 1999). In this opinion, we address the three claims that merit extended discussion.

(1) The defendants argue that the money laundering statute, 18 U.S.C. § 1956, which prohibits certain "transactions" involving "the *proceeds* of some form of unlawful activity" (emphasis added), does not apply to "transactions" involving "proceeds" that were illegally generated *before*

the October 27, 1986 effective date of the act, even if the "transactions" occurred *after* the effective date. They contend that any other reading of the act would render it void for vagueness, or would run afoul of the Ex Post Facto clause of the Constitution. We disagree. The term "proceeds of some form of unlawful activity" includes "proceeds" that were generated by illegal activity before enactment of the statute. Assets are illegal proceeds from the time they are realized in an illegal transaction. No vagueness problem is created because the statute clearly describes the kind of asset that is the subject of the prohibition. The evidentiary ruling admitting evidence of money laundering prior to October 1986 did not violate the Ex Post Facto clause, because that evidence was admissible to show the operation of the charged conspiracy, which began before enactment of § 1956 and continued afterwards.

(2) Defendants challenge the admission of evidence showing that their expenditures far outpaced their reported income, and argue that the government was required to make a preliminary showing of the defendants' "baseline" net worth. We conclude that such a predicate showing is required only in certain tax prosecutions.

(3) Finally, we dismiss Michael De-Maio's challenge to his fine, which falls within the applicable guideline range for his offense.

**BACKGROUND**

The evidence at trial was voluminous, and we summarize here only the facts needed to consider the issues decided in this opinion. "Because defendants appeal their convictions after a jury trial, our statement of the facts views the evidence in the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor." *United States v. Salameh*, 152 F.3d 88, 107 n. 1

---

1. The Honorable Robert W. Sweet of the United States District Court for the Southern

District of New York, sitting by designation.

(2d Cir.1998) (*per curiam*), cert. denied, —— U.S. ——, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999). ·

Jimmy Monaco, a native of Connecticut, moved to Florida in 1970, where he conducted a lucrative drug distribution and piracy operation. He enlisted each of the following family members to launder the proceeds: James and Mary Monaco (his parents), David J. Monaco (his brother), Linda and Michael DeMaio (his sister and brother-in-law), and Kenneth Rohlman (his brother-in-law). Rohlman appeared as a cooperating government witness at trial. The other relatives are defendants-appellants.

Jimmy was arrested and imprisoned on narcotics charges off and on throughout the course of the conspiracy; he has remained in prison since 1989, when he began serving a lengthy sentence. According to Rohlman, Jimmy's various criminal enterprises were topics of conversation at numerous family gatherings at which the appellants were all present.

The numerous transactions shown by the government fall into two broad classes: (i) transportation of Jimmy's money to Connecticut and its retention by family members, in the form of various assets, for use in meeting Jimmy's expenses; and (ii) nominee ownership of property intended to mask Jimmy's ownership of it. The evidence came principally from Rohlman, whose testimony was frequently corroborated with documentary and other evidence.

*A. Recycling Jimmy's Money*

During the 1970s, Rohlman and James Monaco made numerous trips to Florida, coming back each time with large quantities of Jimmy's cash, sometimes hidden in the lining of a trench coat. According to Rohlman, Michael DeMaio recalled he and David Monaco had flown back from Florida in a Lear jet full of cash from Jimmy.

James and Mary buried some of the money in their back yard. David stored some of the money in his house and garage. James, Mary, David, and Linda stored cash in safe deposit boxes. More than $400,000 in cash was deposited in more than 90 accounts that the defendants maintained at 13 Connecticut banks, multiple deposits often being made to different accounts on the same day. (On some of David Monaco's deposit slips, he noted "Jim's money.") James Monaco used some of Jimmy's money to finance construction of the DeMaios' house in Middlefield; when the DeMaios made mortgage payments to James (out of an account that had seen large cash deposits), James deposited the funds in an account he used to pay Jimmy's expenses. This arrangement was typical of the defendants' recycling of Jimmy's money to meet his Florida expenses.

On several occasions, the defendants made cash deposits to their bank accounts just before writing a check in the same amount to meet Jimmy's expenses. Among other expenses incurred by Jimmy, family members paid his legal bills, the upkeep of his properties in Florida, his mortgage, and the docking fees for his boat.

*B. Nominee Ownership*

The defendants acted as nominee owners of various properties of which Jimmy was owner in all but name:

- In the 1970s and 1980s, Jimmy lived in a house in Dania, Florida. However, James Monaco was formally the property's owner; James told Rohlman that Jimmy had proposed this arrangement because it would be difficult for Jimmy to explain owning such a house when he had no job.
- James and Mary Monaco held the deed of a mansion in Deerfield, Florida. At the closing in 1987, they paid $132,000 for the house out of an account into which they had previously made large cash deposits. James and Mary told Rohlman that

they had made an additional $300,000 cash payment "under the table." Jimmy used the mansion to meet with his fellow drug traffickers and to store cash, equipment, cars, and his yacht.

- David Monaco was the owner of a warehouse in Pompano Beach, Florida, that Jimmy used to store drugs, cars and automobile-related equipment. David denied knowing that he was the owner of record, yet documents related to it were found in his home, and he handled the remediation of code violations in 1991.

- Linda and Michael DeMaio owned a house in Miramar, Florida, and James Monaco managed it and paid its expenses. When the house was sold in 1989, Linda and Michael received a proceeds check for nearly $33,000, and immediately cross-endorsed it to James, who then deposited it into an account from which he paid Jimmy's legal expenses.

## DISCUSSION

### A. "Proceeds"

The co-defendants make several tightly related arguments, all based on the (undefined) term "proceeds" in the federal money laundering statute, which states in relevant part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the *proceeds* of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the *proceeds* of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engaged in [tax evasion or fraud]; or

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the owner-

ship, or the control of the *proceeds* of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law shall be sentenced [to a fine, imprisonment, or both].

18 U.S.C. § 1956 (emphases added).

The defendants contend (i) that the statute should not be read to reach any post-enactment conduct related to "proceeds" that were generated before the statute's enactment date of October 27, 1986, but (ii) to the extent that the statute does purport to reach such conduct, that it is void for vagueness, or, in the alternative, violative of the Ex Post Facto clause of the Constitution.

The statute prohibits specified conduct in respect of the certain class of assets described as proceeds of illegal activity, and makes no distinction based on when the illegal activity took place or when the proceeds were received. *See United States v. Glick*, 142 F.3d 520, 524 (2d Cir. 1998) (courts generally adhere to "plain meaning" of a criminal statute). In that respect the statute is analogous to one that criminalizes certain uses of specified firearms; there is no reason to deduce that such a prohibition extends only to guns manufactured after the effective date. *Cf. United States v. Brady*, 26 F.3d 282, 290–91 (2d Cir.1994) (affirming conviction for being a felon in possession of gun, when predicate felony conviction came before enactment of felon-in-possession statute).

■ We reject the vagueness claim for the same reason. The funds involved in this case were the "proceeds of some form of unlawful activity" the moment that Jimmy Monaco realized them from activities that were obviously illegal before enactment of the money laundering statute. Enactment of that statute in 1986 therefore did not (as defendants argue) magically render "clean" money "dirty" at the stroke of midnight on October 27, 1986. *Cf. United States v. Holmes*, 44 F.3d 1150, 1154 (2d Cir.1995) ("Congress has clearly

signaled its intent to treat the money laundering ... as an offense separate from the underlying criminal conduct that generated the laundered ... funds.") There is no vagueness problem with the term "proceeds"; anyone reading the statute would know what was prohibited. *See United States v. Haun*, 90 F.3d 1096, 1101 (6th Cir.1996) (rejecting vagueness challenge to term "proceeds" in § 1956; " '[p]roceeds' is a commonly understood word in the English language").

■ Finally, we reject the Ex Post Facto challenges. The Constitution's Ex Post Facto Clause prohibits, *inter alia*, Congress from enacting a statute that "makes an act a crime that was legal when committed." *United States v. Harris*, 79 F.3d 223, 228 (2d Cir.1996). Michael and Linda DeMaio vehemently interpose the Ex Post Facto clause, but in doing so elide a key fact about their convictions: they were convicted not on any substantive count of money laundering, but for the continuing offense of *conspiracy* to commit money laundering. "It is well-settled that when a statute is concerned with a continuing offense, the Ex Post Facto clause is not violated by application of a statute to an enterprise that began prior to, but continued after, the effective date of the statute." *Id.* at 229 (internal quotation marks and alterations omitted); *see also United States v. Duncan*, 42 F.3d 97, 104 (2d Cir.1994).

■ To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; that he "knowingly" engaged in the conspiracy with the "specific intent to commit the offenses that were the objects of the conspiracy"; and that an overt act in furtherance of the conspiracy was committed. *United States v. Salameh*, 152 F.3d 88, 145–46 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 885, 142 L.Ed.2d 785. When it is shown that a conspiracy straddled the enactment of a statute, the government may introduce pre-enactment evidence to demonstrate the conspiracy's

genesis, its purpose, and its operation over time. *See United States v. Flores*, 538 F.2d 939, 943–44 (2d Cir.1976); *United States v. Smith*, 464 F.2d 1129, 1132–33 (2d Cir.1972). A conviction for a continuing offense straddling enactment of a statute will not run afoul of the Ex Post Facto clause unless it was possible for the jury, following the court's instructions, to convict *"exclusively"* on pre-enactment conduct. *Harris*, 79 F.3d at 229. Here, the jury was soundly instructed on the proper evidentiary value of pre-enactment conduct, and was reminded of the post-statute date range of the charge. Admission of evidence concerning the DeMaios' pre-statutory conduct was proper.

The DeMaios point out that the money laundering statute had not been enacted when they took the deed to Jimmy's Miramar home in 1980 or when they used Jimmy's funds to construct their new home in 1982. The logic of this argument would preclude a conviction based solely on their acquisition of the Miramar house or their construction of their home, but the conviction here rests securely on their continuing stewardship of these properties—on Jimmy's behalf—after enactment of the money laundering statute. *Cf. United States v. Moore*, 27 F.3d 969, 976 (4th Cir.1994) (no Ex Post Facto bar to prosecution involving (post-enactment) sale of property acquired before statute's enactment).

■ There is sufficient evidence that the continued ownership and use of these properties was knowingly designed as part of an attempt "to promote the carrying on of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(A)(i), or "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," *id.* § 1956(a)(1)(B)(i). Specifically, the jury reasonably could have found that the DeMaios agreed to serve as nominee owners of the Miramar property in 1980; that their agreement to play this role continued after 1986; that this ongoing agreement is

evidenced by their taking tax deductions related to the property in 1987, 1989, and 1990 (to keep up the appearance of ownership); and that their continuing role as nominees was demonstrated when they sold the Miramar property in 1989 and immediately remitted the money to James to pay Jimmy's legal bills. Likewise, the jury could have concluded that an ongoing agreement existed regarding the DeMaios' home, which was built in part with a Jimmy-financed mortgage held by his parents, with the DeMaios' mortgage payments going to an account used to pay Jimmy's expenses, all with the DeMaios' knowledge. Additionally, as late as 1992, Linda DeMaio was using her safe deposit box to stash money that (the jury reasonably could have concluded) belonged to Jimmy.[2]

Mary joins her daughter and son-in-law in pressing the Ex Post Facto argument. Like them, she was convicted of conspiracy; her contentions therefore fail for the same reasons. While she was additionally convicted of substantive counts of money laundering, she raises no specific Ex Post Facto objection to any of them. Instead, she argues that these convictions were unconstitutional because they involved "proceeds" generated before enactment of the statute. For the reasons we have already discussed, we reject this claim.

### B.  Income/Expenditure Evidence

■  The government introduced evidence showing that several of the defendants had been spending money in amounts significantly in excess of earnings reported by them on tax returns and Social Security earnings reports. For example, Social Security records reflect that James and Mary Monaco averaged $3,000 in annual income since 1937. Yet they spent more than $600,000 from 1986 to 1991 and had several hundred thousand

more in the bank. They argue that they amassed their funds by thrift; but the jury was permitted to draw the inference that their prosperity was attributable to money laundering.

Relying on a rule drawn from tax evasion cases such as *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), the defendants argue that admission of this evidence was reversible error because the government was required to introduce baseline evidence of the defendants' net worth at the beginning of the relevant time period before introducing evidence of suspiciously large cash expenditures. Such evidence, they contend, was necessary to rule out the possibility that the defendants' high spending could have been funded by liquidation of their preexisting assets. *See, e.g., id.* at 132, 75 S.Ct. at 134; *United States v. Bianco,* 534 F.2d 501, 504 (2d Cir.1976).

We find no error here. In *United States v. Falley,* 489 F.2d 33 (2d Cir.1973), we made it clear that the rule developed in cases such as *Holland* was applicable only in a certain type of tax fraud prosecution:

> [P]roof that a defendant is living far above the means provided by his disclosed income is of great probative value in a case involving a crime where the motive is financial gain. Furthermore, *the establishment of a defendant's opening net worth is not necessary to permit admission of such evidence.* Lack of proof of prior impecunity is a matter of weight and not a matter of admissibility.

*Id.* at 39 (emphasis added). The *Holland* rule is needed in "net worth fraud cases," in which the government generally relies "*exclusively* on the inference to be drawn from the financial evidence." *Id.* at 40. Such cases present the "danger" that a defendant's failure to rebut the expendi-

---

2.  Buried within the Ex Post Facto claim is an argument that the prosecution of the DeMaios violates the statute of limitations. The statute of limitations runs from the date of the last overt act in furtherance of the conspiracy. *See United States v. Scop,* 846 F.2d 135, 138–

39 (2d Cir.1988). Evidence was adduced that the conspiracy continued until 1992; it therefore fell well within the relevant limitations period. *See United States v. Wong,* 40 F.3d 1347, 1367 (2d Cir.1994); *United States v. Flores,* 538 F.2d 939, 943 (2d Cir.1976).

ture evidence "would be completely conclusive on the merits." *Id.* In non-tax cases, however, the government typically cannot rely *solely* on such financial data; it therefore introduces a whole range of evidence, making the "exceptional safeguards" used in the tax context unnecessary. *Id.; see also United States v. Hinton,* 543 F.2d 1002, 1013 (2d Cir.1976) ("Appellants were free to rebut this evidence with proof that they had sufficient prior net worth to fund the expenditures they had made....").

*Falley* and *Hinton* were drug smuggling prosecutions, but the defendants here offer no reason why the analysis in those cases should not apply in the context of a money laundering prosecution. *Cf. United States v. Webster,* 960 F.2d 1301, 1308 (5th Cir. 1992) ("Evidence of a differential between legitimate income and cash outflow is sufficient for a money-laundering conviction, even when the defendant claims income from additional sources.").

## C. Michael DeMaio's Fine

■ Michael DeMaio argues that his $100,000 fine exceeded the maximum fine for his guideline range and, to the extent the fine was the result of an upward departure, was imposed without adequate notice and without a requisite statement of reasons. He also argues that the amount of the fine reflects an inaccurate assumption about the nature of the mortgage on his Middlefield home.

The district court calculated Michael DeMaio's total offense level at 24, a conclusion that DeMaio does not challenge on appeal. The guidelines authorize a maximum fine of $100,000 for this offense level. *See* United States Sentencing Commission, *Guidelines Manual,* § 5E1.2(c)(3). The guideline sentencing range for his offense level (when considered in conjunction with DeMaio's criminal history category of I) was 51 to 63 months. *See id.* ch. 5, pt. A.

At sentencing, the district court decided to depart downward from the sentencing range, principally because it concluded that Michael participated in the money laundering conspiracy out of loyalty to his wife and her family, and sentenced DeMaio to five years of probation—the first six months of which were to be served in home confinement—and a $100,000 fine.[3] (The government does not appeal the departure decision.)

In explaining its decision to reduce DeMaio's sentence, the court said it would "depart downward to Offense Level 10." On appeal, Michael DeMaio seizes upon this statement and points out that the maximum fine for that offense level is $20,000, not $100,000. *See id.* § 5E1.2(c)(3). This argument misapprehends the nature of a downward departure. The district court departed downward from the applicable guideline *sentencing range,* not the *offense level. See id.* § 5K2.0 ("[T]he sentencing court may impose a *sentence outside the range* established by the applicable guidelines ...." (emphasis added)); *cf. United States v. Hargrett,* 156 F.3d 447, 450 n. 1 (2d Cir.) ("A downward departure based on [substantial assistance to the authorities] does not require the district judge to pick a new offense level and a particular sentence within the range set for that level; rather, the court may simply pick a sentence of so many months without mention of an offense level."), *cert. denied,* —— U.S. ——, 119 S.Ct. 607, 142 L.Ed.2d 547 (1998). Although the court said (for analytical purposes) that it was lowering DeMaio's offense level to 10, "[t]his mode of analysis was not required by the Guidelines." *Id.*

Notwithstanding the downward departure on DeMaio's sentence, his offense level therefore remained 24. Since the fine imposed was within the applicable guide-

---

**3.** Citing 18 U.S.C. § 3572(a)(5) (establishing "the need to deprive the defendant of illegally obtained gains from the offense" as factor in fine calculation), Judge Thompson set the combined fines for Michael and Linda DeMaio at a figure comparable to their gain when James Monaco forgave the (Jimmy-financed) mortgage on their home.

line range (and there is no claim of a violation of law or misapplication of the guidelines), it is not appealable. *See United States v. Leonard,* 37 F.3d 32, 40 (2d Cir.1994). We therefore dismiss so much of Michael DeMaio's appeal as challenges his fine.

## CONCLUSION

For these reasons (and those provided in the summary order), the appeal is dismissed in part, and the judgment of the district court is affirmed in remaining part.