07-4005-cr
USA v. Marcus

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term, 2007

(Argued: January 9, 2008                    Decided: August 14, 2008)

Docket No. 07-4005-cr

————————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

GLENN MARCUS,

*Defendant-Appellant.*

————————

B e f o r e :

STRAUB, SOTOMAYOR and WESLEY,

*Circuit Judges.*

————————

　　　　Appeal from a September 18, 2007 judgment of conviction and sentence of the United States District Court for the Eastern District of New York (Allyne R. Ross, *Judge*), sentencing defendant principally to a term of 108 months' imprisonment following conviction after a jury trial of violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589 and 1591. Because we conclude that the District Court committed plain error in failing to instruct the jury with respect to the date of the enactment of the TVPA, the judgment of the District Court is VACATED, and the case is REMANDED to the District Court for proceedings consistent with this opinion.

　　　　Judges SOTOMAYOR and WESLEY concur in a separate opinion.

————————————————

HERALD PRICE FAHRINGER (Erica T. Dubnow, *on the brief*), Fahringer & Dubno, New York, NY, *for Defendant-Appellant.*

PAMELA CHEN, Assistant United States Attorney (Peter A. Norling, Assistant United States Attorney, Benton J. Campbell, United States Attorney, Grace Chung Becker, Acting Assistant Attorney General, Jessica Dunsay Silver, Tovay R. Calderon, Attorneys, Department of Justice, Civil Rights Division, Appellate Section, *on the brief*) Eastern District of New York, Brooklyn, NY, *for Appellee.*

————————————————

PER CURIAM:

Defendant-Appellant Glenn Marcus appeals from a September 18, 2007 judgment of

conviction and sentence of the United States District Court for the Eastern District of New York

(Allyne R. Ross, *Judge*), sentencing defendant principally to a term of 108 months'

imprisonment following conviction after a jury trial of violations of the Trafficking Victims

Protection Act ("TVPA"), 18 U.S.C. §§ 1589 and 1591.  Marcus argues, *inter alia*, that his

conviction amounted to a violation of the Ex Post Facto Clause of the Constitution. For the

reasons set forth below, we agree.  The judgment of the District Court is vacated, and the case is

remanded to the District Court for proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are exhaustively set forth in the District Court's opinion. *See United*

*States v. Marcus*, 487 F. Supp. 2d 289, 291-97 (E.D.N.Y. 2007).  We recite only those facts

relevant to the Ex Post Facto challenge.

At trial, the government presented evidence that in 1998, Glenn Marcus, who was living

in New York at the time, met Jodi,[1] the complaining witness, in an online chat room devoted to

an alternative sexual lifestyle, known as bondage, dominance/discipline, submission/sadism, and

masochism ("BDSM").  Marcus, with the help of two of his "slaves," Joanna and Celia,

convinced Jodi to travel from her home in the Midwest to Joanna's apartment in Maryland, in

order to meet Marcus in person, which she did in October 1998.  During this visit, Marcus

---

[1] At trial, the District Court granted the government's motion to allow witnesses to testify using their first names only. *See Marcus*, 487 F. Supp. 2d at 293 n.2.

2

whipped Jodi and carved the word "slave" on her stomach with a knife. Jodi returned to Joanna's apartment in Maryland for a second visit in November 1998.

After her second visit, Marcus convinced Jodi to move from the Midwest to Maryland, where she would live with Joanna. Jodi submitted to Marcus a petition, in which she referred to herself as "pooch," a name given to her by Marcus, and stated, among other things, "I am begging to serve you Sir, completely, with no limitations. . . . If I beg you for my release, Sir, please ignore these words." Despite this petition, Jodi testified that she believed she would be able to leave Marcus if she wanted to.

Jodi moved into Joanna's apartment in January 1999, and Marcus visited them in Maryland every one to two weeks. During these visits, Marcus engaged in BDSM activities with Jodi and Joanna, and sometimes other women. These activities included branding Jodi, requiring her to seek his permission before contacting her family, whipping and choking her during intercourse, photographing her for his website, "Subspace," and requiring her to post diary entries describing the activities on the website. The BDSM activity, along with the "punishments" for disobedience, increased in severity during this time, and Jodi testified that she became increasingly depressed.

At some point, Marcus instructed Jodi to convince her younger sister to travel to Maryland, and when she refused, Marcus told her that she would be severely punished. In October 1999, Marcus arrived in Maryland to inflict Jodi's punishment. He handcuffed her to a wall and left to take a nap, informing her that he would return to inflict the punishment. Jodi testified that at this point, she had a moment of clarity and decided to leave Marcus. She

3

convinced Celia to help her off the wall, but Joanna awakened Marcus. Jodi told Marcus that she wanted to leave, and in response, Marcus inflicted upon Jodi the most severe punishment she had ever received up to this point. The incident was photographed for Marcus's website. Jodi testified that at this point, the relationship became non-consensual, as she felt "completely beaten down," "trapped," and "full of terror."

In November 1999, Joanna informed Marcus, by phone, that she wished to leave him. With Jodi listening on the line, Marcus threatened that he would show Joanna's pictures to her family and that he would harm members of her family if she were to leave him. Jodi testified that, as a result of having heard this conversation, she thought that Marcus would do the same to her were she to leave.

In January 2000, Marcus instructed Jodi to move to New York, where she lived with Rona, another one of Marcus's "slaves." Marcus instructed Jodi to create a new website, called "Slavespace." After creating the site, Jodi worked on it for approximately eight to nine hours per day, updating pictures and diary entries. Marcus received all site-related revenues, which consisted primarily of membership fees and advertising. During the time that Jodi lived with Rona, Marcus continued to engage in violent sexual behavior with her, punishing her severely when he was unhappy with her work on the website. Jodi testified that each of these incidents was non-consensual, but that she was afraid to leave him. At one point, when she told Marcus that she wanted to leave, he threatened to send pictures to her family and the media.

Finally, in March 2001, Marcus told Jodi that she would be allowed to leave him, but that she had to endure one final punishment. He drove her to the home of a woman named Sherry

4

and there inflicted severe punishment upon Jodi, including banging her head against a beam in the ceiling of Sherry's basement, tying her hands and ankles to the beam, beating her and whipping her while she was hanging from the beam, drugging her, and having sexual intercourse with her. He photographed the incident and forced Jodi to write a diary entry about the incident for his website. Jodi continued to live with Rona until August 2001, when Rona told Marcus that she no longer wanted Jodi to live with her. Jodi moved into her own apartment, and her interactions with Marcus became less frequent, although she remained in contact with him until 2003.

On February 9, 2007, the government filed a superceding indictment, charging Marcus with violating the sex trafficking statute, 18 U.S.C. § 1591(a)(1),[2] and the forced labor statute, 18 U.S.C. § 1589,[3] of the Trafficking Victims Protection Act ("TVPA") "[i]n or about and between

---

[2] This section provides, in relevant part: "Whoever knowingly . . . in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, or obtains by any means a person . . . knowing that force, fraud, or coercion . . . will be used to cause the person to engage in a commercial sex act . . . shall be punished . . . ." 18 U.S.C. § 1591(a)(1). "The term 'commercial sex act' means any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(c)(1). "The term 'coercion' means . . . threats of serious harm to or physical restraint against any person; . . . any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or . . . the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(c)(2).

[3] This section provides, in relevant part: "Whoever knowingly provides or obtains the labor or services of a person . . . by threats of serious harm to, or physical restraint against, that person or another person; . . . by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or . . . by means of the abuse or threatened abuse of law or the legal process, shall be [punished]." 18 U.S.C. § 1589.

January 1999 and October 2001." Marcus was convicted, after a jury trial, of both counts.[4]

Although the TVPA was not enacted until October 2000, the government presented evidence at trial with respect to the entire period charged in the indictment, and the District Court did not instruct the jury with respect to the date of the enactment of the statute. At the time, Marcus did not object to the jury instructions on this ground, and he did not raise any argument to this effect in his motion for a judgment of acquittal under Fed. R. Crim. P. 29.

**DISCUSSION**

Marcus argues for the first time on appeal that the TVPA has been applied retroactively in his case in violation of the Ex Post Facto Clause of the United States Constitution. Because Marcus failed to raise this argument before the District Court, it is reviewed for plain error. *See United States v. Torres*, 901 F.2d 205, 227-28 (2d Cir. 1990). "To establish plain error, the defendant must establish (1) error (2) that is plain and (3) affects substantial rights." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007). "If the error meets these initial requirements, we then must consider whether to exercise our discretion to correct it, which is appropriate only if the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id*. (internal quotation marks omitted).

The Constitution provides that "[n]o ... ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3.

> The Supreme Court has interpreted this clause as prohibiting Congress from passing a law that: (1) makes an act a crime that was legal when committed; (2) makes a

---

[4] The indictment also charged Marcus with obscenity in violation of 18 U.S.C. § 1462, and the jury acquitted him of that count. This portion of the jury's verdict has not been appealed.

crime greater than it was when it was committed; (3) increases the punishment for a crime after it has been committed; or (4) deprives the accused of a legal defense that was available at the time the crime was committed.

*United States v. Harris*, 79 F.3d 223, 228 (2d Cir. 1996). "While the Ex Post Facto Clause itself is a restraint on the legislative branch, its protections have been extended to the application of judicial precedent by the courts under the Due Process Clause of the Fifth Amendment." *Id*. at 228-29.

It is undisputed that the indictment charges Marcus with violating the statute between January 1999 and October 2001, that the government presented evidence at trial with respect to this entire time period, that the TVPA was enacted in October 2000, and that the District Court failed to instruct the jury with respect to this issue. This case, therefore, clearly implicates the Ex Post Facto Clause. However, the government argues that the sex trafficking and forced labor offenses constitute continuing offenses, and that even though the criminal conduct at issue began prior to enactment of the TVPA, it continued after enactment; accordingly, no violation occurred here. "It is well-settled that when a statute is concerned with a continuing offense, the Ex Post Facto Clause is not violated by application of a statute to an enterprise that began prior to, but continued after, the effective date of the statute." *Id*. at 229 (internal quotations marks and alterations omitted). Marcus argues that the sex trafficking and forced labor offenses do not constitute continuing offenses.

We need not decide whether the offenses constitute continuing offenses for Ex Post Facto purposes because, even if they do, the convictions violate the Ex Post Facto Clause. In *Torres*, we have stated that, even in the case of a continuing offense, if it was *possible* for the jury—who

7

had not been given instructions regarding the date of enactment—to convict *exclusively* on pre-enactment conduct, then the conviction constitutes a violation of the Ex Post Facto clause. 901 F.2d at 229. *See also United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999) ("A conviction for a continuing offense straddling enactment of a statute will not run afoul of the Ex Post Facto clause unless it was possible for the jury . . . to convict *exclusively* on pre-enactment conduct.") (internal quotation marks omitted) (emphasis in original); *Harris*, 79 F.3d at 229 ("Because the []statute is a continuing crime statute, we must determine whether it was possible for the jury . . . to convict Harris *exclusively* on pre-[] enactment conduct.") (emphasis in original). This is true even under plain error review. *See Torres*, 901 F.2d at 229 (holding under plain error review that, although it was unlikely that the jury had based its findings entirely on pre-enactment conduct, because such a scenario was a possibility, the defendant's conviction had to be vacated).[5] Here, the government concedes that "the jury could have found that Marcus violated Sections 1591 and 1589 solely by his conduct prior to their effective dates, because there was evidence before it that established all of the elements of these offenses as of that time." Specifically, the government concedes that before enactment of the statute: (1) Jodi moved from the Midwest to Maryland; (2)

---

[5] The government's reliance on *United States v. Duncan*, 42 F.3d 97, 104-05 (2d Cir. 1994), is misplaced. In *Duncan*, the jury was properly instructed on the Ex Post Factor Clause and was, in fact, required on the verdict form to find that an overt act in furtherance of the fraud or conspiracy had occurred after the effective date of the statute. Thus, there was no issue on appeal as to whether the jury had relied exclusively on pre-enactment conduct because it was undisputed that it had not. Accordingly, our holding in *Torres* was not implicated. Rather, the challenge in *Duncan* was whether, as a matter of law, the defendant's post-enactment conduct could be considered part of his criminal scheme (i.e., a continuation of the criminal venture), or whether the scheme had been fully executed before enactment of the statute. Thus, our holding was only that the convictions were not *barred* as a matter of law by the Ex Post Facto Clause. *See id*. at 105.

8

Jodi's relationship with Marcus became non-consensual; (3) Marcus threatened Joanna in Jodi's hearing; (4) Marcus forced Jodi to work on his existing website as well as create a new website; and (5) Jodi moved from Maryland to New York. Accordingly, the application of the TVPA in such a manner constituted an Ex Post Facto Clause violation, and the conviction must be vacated under our holding in *Torres*.[6]

The government argues that we should not vacate the convictions because it was a "remote possibility" that the jury relied exclusively on pre-enactment conduct; however, that argument is foreclosed by our decision in *Torres*, where we held that a retrial is necessary whenever there is any possibility, no matter how unlikely, that the jury could have convicted based exclusively on pre-enactment conduct.[7]

---

[6] Marcus also argues that the evidence presented at trial was insufficient to support his convictions. Although we are vacating the conviction on Ex Post Facto grounds, we nonetheless hold, for substantially the same reasons set forth in the District Court's opinion, that the totality of the evidence presented at trial was sufficient to support the convictions. *See, e.g., United States v. Meneses-Davila*, 580 F.2d 888, 896 (5th Cir. 1978) ("Since this ground of reversal permits the Government to retry defendant, we must reach defendant's sufficiency of the evidence argument, because the Government may not retry defendant if the evidence at the first trial was insufficient."); *United States v. Watson*, 623 F.2d 1198, 1200 (7th Cir. 1980); *United States v. McManaman*, 606 F.2d 919, 927 (10th Cir. 1979); *United States v. U. S. Gypsum Co.*, 600 F.2d 414, 416 (3d Cir.), *cert. denied*, 444 U.S. 884 (1979); *United States v. Orrico*, 599 F.2d 113, 116 (6th Cir. 1979). We need not and do not decide whether only the post-enactment evidence was sufficient to sustain the convictions, because, even assuming it was not, double jeopardy would not bar retrial. *See, e.g., United States v. Mandel*, 591 F.2d 1347, 1371-74, *rev'd en banc on other grounds*, 602 F.2d 653 (4th Cir. 1979), *cert. denied*, 445 U.S. 961 (1980); *United States v. Harmon*, 632 F.2d 812, 814 (9th Cir. 1980) (per curiam). We need not address the remainder of Marcus's arguments on appeal.

[7] We note that a serious question exists as to whether 18 U.S.C. § 1591 could constitute a continuing offense. The statute's plain language appears to require knowledge of "force, fraud, or coercion" at the time of the knowing recruitment, enticement, harboring or transport. We caution the government that, on remand, it may be well served by ensuring that the jury's

9

**CONCLUSION**

For the foregoing reasons, we VACATE the judgment of the District Court. The case is

REMANDED to the District Court for proceedings consistent with this opinion.

─────

─────────────────────

instructions make clear that these elements are temporally aligned.

10

SOTOMAYOR, *Circuit Judge*, with whom Judge WESLEY joins, concurring:

Judge Wesley and I concur with the *per curiam* opinion because its conclusions are compelled by the current law of this circuit. We write separately because we believe this Court's precedent with regard to plain-error review of ex post facto violations does not fully align with the principles adhering in the Supreme Court's recent applications of plain-error review.

Under plain-error review, an appellate court cannot correct an error not raised at trial unless there is "(1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal quotation marks and citation omitted). In its recent applications of plain-error review, the Supreme Court has stated that where a trial court commits an error that is plain, that error does not seriously affect the fairness, integrity, or public reputation of the judicial proceedings if the error concerns an "essentially uncontroverted" issue. *United States v. Cotton*, 535 U.S. 625, 633 (2002); *Johnson*, 520 U.S. at 470. Our case law appears to conflict with this precedent because it requires a retrial whenever there is *any* possibility that an improperly instructed jury could have convicted a defendant based exclusively on conduct committed prior to the enactment of the relevant statute, *see United States v. Torres*, 901 F.2d 205, 229 (2d Cir. 1990), even where it is "essentially uncontroverted" that the defendant's relevant conduct before and after the statute's enactment was materially indistinguishable. We write to bring this issue to our Court's attention and to

11

explain how this difference affects the outcome of this appeal.[1]

In *Johnson*, the defendant was convicted of perjury under 18 U.S.C. § 1623.  One element of that crime—the materiality of the defendant's false statement—was unconstitutionally decided by the trial judge, rather than by the jury.  *See Johnson*, 520 U.S. at 463-64; *see also United States v. Gaudin*, 515 U.S. 506, 522-23 (1995).  The Supreme Court nevertheless affirmed the conviction, explaining that the error did not affect the fairness, integrity, or public reputation of the judicial proceedings because the evidence of materiality was "overwhelming" and "essentially uncontroverted."  520 U.S. at 469-70.  Because Johnson had "no plausible argument that the false statement under oath for which she was convicted . . . was somehow not material," the Supreme Court concluded there was no "miscarriage of justice" in not taking notice of the error.  *Id.* at 470.

Likewise, in *Cotton*, the defendants were convicted of conspiring to distribute and to possess with intent to distribute a detectable amount of cocaine and crack cocaine.  The indictment, however, failed to allege drug quantity, a fact that increased the statutory maximum penalty, rendering the defendants' enhanced sentences unconstitutional.  *See Cotton*, 535 U.S. at 632; *see also Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000) ("[A]ny fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." (internal quotation marks omitted)).  Again, the Supreme Court held this error did not affect the fairness, integrity, or public reputation of the proceedings because the evidence that the drug conspiracy involved at least 50 grams of

---

[1] We note that our concern here applies only to our review of ex post facto violations under the plain-error standard.

cocaine base was "overwhelming" and "essentially uncontroverted." *Cotton*, 535 U.S. at 633; *see also id.* ("Surely the grand jury, having found that the conspiracy existed, would have also found that the conspiracy involved at least 50 grams of cocaine base."). "The real threat . . . to the 'fairness, integrity, and public reputation of judicial proceedings,'" the Supreme Court explained, "would be if [the defendants], despite the overwhelming and uncontroverted evidence that they were involved in a vast drug conspiracy, were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial." *Id.* at 634.

These cases embody the Supreme Court's view that there is no "miscarriage of justice" in refusing to notice forfeited errors that did not affect the judgment. *See Johnson*, 520 U.S. at 470. This is true even if the errors fall within the "limited class" of "structural errors" that "affect[] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 468. We see no reason why this principle should not apply to the context of ex post facto violations. While the Ex Post Facto Clause is certainly fundamental to our notions of justice, *see Marks v. United States*, 430 U.S. 188, 191-192 (1977), it is no more so than the Fifth and Sixth Amendment rights at issue in *Johnson* and *Cotton*. *See, e.g.*, *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) (describing the right to trial by jury in serious criminal cases to be "fundamental to the American scheme of justice").

Thus, where there is no reasonable possibility that an error not objected to at trial had an effect on the judgment, the Supreme Court counsels us against exercising our discretion to notice that error. Within the context of the Ex Post Facto Clause, we believe this means that where the evidence is "overwhelming" or "essentially uncontroverted" that the defendant's relevant pre-

13

and post-enactment conduct is materially indistinguishable, such that a reasonable jury would not have convicted the defendant based solely on pre-enactment conduct, a retrial is unwarranted. In other words, the defendant must meet the low threshold of offering a plausible explanation as to how relevant pre- and post-enactment conduct differed, thereby demonstrating a reasonable possibility that the jury might have convicted him or her based exclusively on pre-enactment conduct. When this requirement is not met, the error does not seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

Our standard—announced in *Torres*, 901 F.2d at 229, and repeated in *United States v. Harris*, 79 F.3d 223, 229 (2d Cir. 1996), and *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999)—appears to conflict with the *Cotton* and *Johnson* decisions because it requires a retrial whenever there is any factual possibility that a jury could have convicted a defendant based exclusively on pre-enactment conduct, even if such a scenario is highly implausible. Our Court has never directly addressed this possible conflict. Indeed, our opinion in *Torres* preceded the *Cotton* and *Johnson* decisions, and we did not apply the Supreme Court's current four-part plain-error analysis in crafting our standard. We have since had no occasion to evaluate whether the *Torres* standard comports with *Johnson* and *Cotton* because we concluded in both *Monaco* and *Harris* that there was no error even under the *Torres* "any possibility" standard. Accordingly, our Court may wish to reexamine its precedent to ensure that it does not conflict with Supreme Court precedent.[2]

---

[2] Whether or not we reexamine our precedent, further guidance from the Supreme Court on this issue may be helpful, especially in light of the various plain-error standards applied by our sister circuits for ex post facto violations. *See United States v. Munoz-Franco*, 487 F.3d 25, 57-58 (1st Cir. 2007) (noting the split in the circuit standards). For example, the Third Circuit has applied our standard from *Torres*, examining whether there is any possibility that the jury could

Were this Court to adopt a reasonable possibility standard, we believe that we should exercise our discretion to notice the forfeited ex post facto error for Glenn Marcus's sex-trafficking conviction, but not for his forced-labor conviction.[3] With regard to the sex-trafficking conviction, Marcus's relevant conduct differed materially before and after October 2000, such that there is a reasonable possibility that the jury may have convicted him based exclusively on pre-enactment conduct. The sex-trafficking statute makes it illegal to knowingly, in or affecting interstate commerce, recruit, entice, harbor, transport, provide, or obtain by any means a person knowing that force, fraud, or coercion will be used to cause the person to engage in a commercial sex act. 18 U.S.C. § 1591. The government alleged that Marcus engaged in several trafficking activities with the requisite mens rea: (1) that he recruited, enticed, and obtained Jodi when he met her online in late 1998; (2) that he transported Jodi from Maryland to New York in January

have convicted the defendant based exclusively on pre-enactment conduct. *See United States v. Tykarsky*, 446 F.3d 458, 481-82 (3d Cir. 2006). The First Circuit, however, has held that a retrial is unwarranted where there was "nothing to differentiate appellants' pre-enactment conduct from subsequent conduct" and thus "a reasonable jury would not have convicted the appellants based solely on pre-enactment conduct." *Munoz-Franco*, 487 F.3d at 57-58. Similarly, the Seventh Circuit, in a continuing conspiracy case, explained its plain-error standard as whether a reasonable jury, properly instructed on this point, could have concluded that the conspiracy had ended before the relevant date or that the defendant had withdrawn from the conspiracy before that date. *See United States v. Julian*, 427 F.3d 471, 482-83 (7th Cir. 2005). Finally, the Fifth Circuit has examined whether the bulk of the evidence focused on events occurring after the enactment of the statute. *See United States v. Todd*, 735 F.2d 146, 150 (5th Cir. 1984).

[3] As explained in the *per curiam* opinion, Marcus was convicted of sex trafficking, 18 U.S.C. § 1591, and forced labor, 18 U.S.C. § 1589, based on his conduct from January 1999 until October 2001. Neither of these statutes was effective until October 28, 2000. As a result, the district court's failure to instruct the jury that Marcus could not be convicted based on his conduct before this date was plainly erroneous in light of the Ex Post Facto Clause's prohibition against making an act a crime that was legal when committed, *see Harris*, 79 F.3d at 228. Because the government presented evidence that Marcus had fulfilled all the elements of both crimes before October 2000, thus making it factually possible that the jury could have convicted him based exclusively on pre-enactment conduct, we must vacate both convictions under *Torres*.

15

2000; and (3) that he harbored Jodi from 1999 until 2001.  Only the harboring activity occurred

after the October 2000 effective date of the statute.  Thus, if the jury concluded that Marcus did

not harbor Jodi within the meaning of the statute,[4] but did recruit, entice, or obtain her in 1998 or

transport her in 2000, it would have convicted him based only on pre-enactment conduct.  This

material difference in conduct demonstrates a reasonable possibility that the jury may have relied

exclusively on pre-enactment conduct.  Under such circumstances, a retrial is necessary.

In contrast, with respect to the forced-labor conviction, Marcus has no plausible argument

as to why the jury would have differentiated between his conduct before and after the enactment

of the statute.  Here, the government alleged that from January 2000 until at least the spring of

2001, Marcus forced Jodi, through threat of serious physical harm and actual physical harm, to

create and maintain a commercial BDSM website.  Jodi testified that throughout this time period

she was forced to work eight to nine hours a day maintaining the website and that Marcus would

punish her whenever she failed to update the site quickly enough.[5]  Marcus has been unable to

offer any explanation of how his pre- and post-enactment conduct differed in any relevant way.[6]

Indeed, his central argument on the forced-labor charge appears to be that "because of the

---

[4] We note that the evidence of harboring was not "overwhelming."  While it is undisputed that Marcus set Jodi up with a place to live at his friend's apartment in New York from January 2000 until 2001, Marcus never personally provided Jodi with housing, and the jury could have found that his actions did not amount to harboring.  Alternatively, the jury may have never reached this issue, instead basing its findings on other alleged trafficking activities.

[5] In fact, the government presented evidence that one of the most severe punishments Marcus imposed on Jodi for her work on the website occurred in April 2001.

[6] Marcus notes that Jodi designed the website before the enactment of the statute and only maintained the site after the effective date.  This distinction, however, is immaterial for purposes of the forced-labor statute.

16

volatile evidence in the sex trafficking prosecution, which included the admission of highly prejudicial photographs and graphic images, there was a very serious spillover impact on the forced labor charges." Because it is "essentially uncontroverted" that Marcus's relevant conduct was materially indistinguishable before and after the enactment of the statute, there is no reasonable possibility that the jury would have convicted him based only on his pre-enactment conduct and not on his post-enactment conduct. In other words, a rational jury would have either convicted Marcus for his conduct during this entire period or not at all. Because the district court's error in failing to instruct the jury on the Ex Post Facto Clause did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings, his conviction should not be vacated for this error.

Nevertheless, we join the *per curiam* opinion in vacating both of Marcus's convictions because the *Torres* standard remains the law of this circuit. *See Bd. of Educ. v. Hufstedler*, 641 F.2d 68, 70 (2d Cir. 1981) ("A panel of this court is bound by a previous panel's opinion, until the decision is overruled en banc or by the Supreme Court."). For the reasons discussed, however, we believe that our precedent warrants reexamination.